```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2

 3   ------------------------------------------------------------

 4   ARGO GLOBAL SPECIAL SITUATIONS Case No.: 0:10-cv-3614-SRN-JJG
     FUND, ARGO DISTRESSED CREDIT
 5   FUND, BLACK RIVER EMCO MASTER
     FUND, LTD., BLACK RIVER                    TRANSCRIPT
 6   EMERGING MARKETS CREDIT FUND,
     LTD., BLUEBAY MULTI-STRATEGY                  OF
 7   (Master) FUND, LTD., CARVAL
     (CVIGVF (LUX))MASTER S,a,r,l,            PROCEEDINGS
 8   STANDARD AMERICAS, INC.,
     STANDARD BANK PLC., BLUEBAY          (MOTIONS HEARING)
 9   SPECIALISED FUNDS: EMERGING
     MARKET OPPORTUNITY (Master)
10   FUND,

11                   Plaintiffs,

12                   vs.

13   WELLS FARGO BANK, NATIONAL
     ASSOCIATION, as Indenture
14   Trustee, TRISTAN OIL, LTD.,
     GLG ATLAS MACRO FUND,
15   RENAISSANCE SECURITIES (Cyprus),
     Ltd., VISION ADVISORS III, LTD.,
16   SPUTNIK GROUP, LTD.,

17                   Defendants.

18   ------------------------------------------------------------

19           The above-entitled matter came on for MOTIONS

20   HEARING before Judge Susan R. Nelson, on April 7th, 2011, at

21   the United States District Courthouse, 316 N. Robert Street,

22   St. Paul, Minnesota 55101, commencing at  approximately

23   1:30 p.m.

24   REPORTED BY:  RONALD J. MOEN, OFFICIAL COURT REPORTER, CSR,

25   RMR.
```

1                               <u>APPEARANCES</u>

2              FAEGRE & BENSON, L.L.P., 90 South Seventh

3   Street, Suite 2200, Minneapolis, Minnesota 55402-3901, by

4   MICHAEL B. FISCO and MICHAEL M. KRAUSS, Attorneys at Law,

5   appeared as counsel on behalf of Plaintiffs.

6              DORSEY & WHITNEY, L.L.P., 50 South Sixth

7   Street, Suite 1500, Minneapolis, Minnesota 55402-1498, by

8   STEVEN J. HEIM, Attorney at Law, appeared as counsel on

9   behalf of Defendant, Wells Fargo Bank, National Association.

10           SALANS, L.L.P., 620 Fifth Avenue, New York, New

11   York 10020-2457, by ANTHONY B. ULLMAN, Attorney at Law, pro

12   hac vice; and

13           LARKIN, HOFFMAN, DALY & LINDGREN, Ltd., 7900

14   Xerxes Avenue South, Suite 1500, Minneapolis, Minnesota

15   55431-1194, by JON S. SWIERZEWSKI, Attorney at Law, appeared

16   as counsel on behalf of Defendant, Tristan Oil, Ltd.

17           DEBEVOISE & PLIMPTON, L.L.P., 919 Third Avenue,

18   New York, New York 10022, by MICHAEL E. WILES, Attorney at

19   Law, pro hac vice; and

20           HENSON & EFRON, P.A., 220 South Sixth Street,

21   Suite 1800, Minneapolis, Minnesota 55402-4503, by JOSEPH T.

22   DIXON, JR., Attorney at Law, appeared as counsel on behalf of

23   Defendants, GLG Atlas Macro Fund, Renaissance Securities

24   (Cyprus), Ltd., and Vision Advisors III, Ltd.

25

1          THE COURT:  Good afternoon, everybody.  We are
2  here this afternoon in the matter of Argo Global Special
3  Situations Fund, et al., versus Wells Fargo Bank, et al.
4  This is Civil File Number 10-3614.  We are here to consider
5  two motions, defendant Tristan Oil's Motion to Dismiss, and
6  defendant GLG Atlas Macro Fund's Motion to Dismiss.
7          Let's begin by having counsel note your
8  appearances.
9          MR. WILES:  Good afternoon, your Honor.  I'm
10  Michael Wiles, from Debevoise & Plimpton, for Renaissance,
11  GLG, and Vision.
12          THE COURT:  Good afternoon.
13          MR. DIXON:  Your Honor, Joe Dixon, of Henson &
14  Efron, and I'm here today with Mr. Wiles, who will be doing
15  the arguing.
16          THE COURT:  Very good.
17          MR. ULLMAN:  Good afternoon, your Honor.
18  Anthony Ullman, from Salans.  I represent Tristan.
19          MR. SWIERZEWSKI:  I'm Jon Swierzewski, your
20  Honor.  I'm here with Defendant, Tristan Oil.
21          THE COURT:  Very good.
22          MR. FISCO:  Good afternoon, your Honor.
23  Michael Fisco and Michael Krauss, from Faegre & Benson, on
24  behalf of the Plaintiffs, affectionately known as the
25  existing holder of the notes.

1          THE COURT: Okay. "Affectionately known," did

2  you say?

3          MR. HEIM: Steve Heim, from Dorsey & Whitney,

4  on behalf of Wells Fargo Bank, National Association, as

5  Indenture Trustee.

6          THE COURT: Very good. Okay. I think we will

7  hear the motions in the order in which they were filed.

8  We'll begin with Tristan Oil's motion.

9          MR. WILES: If it's all right with you, your

10  Honor, there are some issues that are common, and Mr. Ullman

11  and I had agreed that I would argue those.

12          THE COURT: That's just fine.

13          MR. ULLMAN: I'll just comment briefly on those

14  when he's done. But he'll take the lead on a number of them,

15  your Honor.

16          THE COURT: No problem.

17          MR. WILES: Good afternoon again, your Honor.

18  The last time I was here you asked me how I liked the

19  temperature. I like it today much better. I think it's

20  about 70 degrees warmer today than it was in February, when I

21  was here.

22          THE COURT: Well, I hope you thanked your lead

23  counsel for that.

24          MR. WILES: I did. I absolutely did. Also, if

25  it's all right with you, I thought I would dispense with all

1      of the football arguments in our papers, unless you want to

2      hear any of those again.

3                    THE COURT:  I kind of heard a little bit about

4      that.

5                    MR. WILES:  Yeah, I figured you probably had

6      enough of that over the last few days.

7                    More seriously, you've heard us before, you've

8      seen all the papers.  You probably don't need me to give you

9      any background about the parties and the transaction.  I'm

10     more than happy to do that if you would find it useful.

11     Unless you would like it, I'll go straight into the argument.

12                   THE COURT:  I think you should go straight into

13     your argument.

14                   MR. WILES:  Thank you.  As we have pointed out,

15     and I think this is undisputed, there is no subject-matter

16     jurisdiction in this court unless there is diversity of

17     citizenship.  And that is only true if there is a U.S.

18     citizen on each side of this dispute who is a real party in

19     interest.  All of the other plaintiffs, all of the

20     defendants, with the exception of named defendant, Wells

21     Fargo, are foreign parties.  The case law is also clear that

22     if Wells Fargo is just a nominal party, then it gets ignored

23     for purposes of diversity jurisdiction.  And the dispute

24     between the parties is whether Wells Fargo does or does not

25     fall into the category of what the cases describe as a

1    "nominal party."  Now, on that point there is agreement that

2    no wrongdoing has been alleged by Wells Fargo, and no claims

3    have been asserted against Wells Fargo in the sense of "You

4    breached 'X' duty to me," or anything like that.  There is a

5    claim for injunction that names Wells Fargo, that seeks

6    relief against Wells Fargo, but not because of anything that

7    Wells Fargo itself has done.  It's there to facilitate relief

8    in the event that a court were to rule on the basis of the

9    claims that have been asserted against Tristan and against my

10   clients, the new noteholders.  And we submit under that set

11   of facts that Wells Fargo is a classic nominal party.  And

12   one of the ways to think about this is -- I think a comment

13   that you made the first time around, that's also picked up in

14   the *Pesch* case that we've cited in our reply papers, that

15   it's all well and good for plaintiffs to talk about how

16   useful it is to have Wells Fargo in the case in facilitating

17   the remedy that they want, but there's a distinction between

18   the remedy and a cause of action, or the way you put it, I

19   believe, was you have to have jurisdiction over the

20   underlying claims in order to render a decision on those.

21   And the only causes of action here that would give rise to a

22   remedy are claims against Tristan and claims against the new

23   noteholders.  There is no claim against Wells Fargo.  So the

24   question for jurisdiction is do you have jurisdiction over

25   the causes of action.  And you plainly don't, because there

is no U.S. citizen against which any cause of action actually has been asserted. Now, what about the various things that plaintiffs have pointed to in their papers and supposedly making this different from the other cases. I think if you just line up those other cases, you can see that there's no difference whatsoever. One, the plaintiffs say: "Well, we're seeking an injunction." That's a different situation. Well, the case they cite for that proposition actually held that where an injunction was not sought and no relief was sought and no wrongdoing was alleged, the party in that case -- which I believe was the state of Florida, but it's hard to remember all the cases -- the party in that case was just a nominal plaintiff. That does not mean the opposite, that just because you ask for an injunction, you suddenly are no longer nominal. And, in fact, in many of the cases that we have cited to you, including the *Colman* case, which involved an executor, the *Wygal* case, the *Pesch* case, the *Prudential Real Estate Affiliates* case, and the *Alberto Culver* case, all of them included requests for injunctions, all of them were deemed to be nominal parties.

What about the argument that they need Wells Fargo because they have to tell Wells Fargo what to do with any money it receives from Tristan, and who to distribute it to. Well, that's always the case in practically every one of the nominal-party cases we've cited to you. It's true in the

*Cherif* case and the *Colello* case, which are the SEC cases,
it's true in the *Andrews* case that we cited in our reply
papers, which is explicitly an indenture trustee case, it's
true of the *Colman* case, which involved an executor, the
*Godley v. Valley View* case, *Walden v. Skinner*, an ancient
Supreme Court decision, and the *Alberto Culver* case, again,
which is one of the cases that plaintiffs rely on.  All of
those are situations where parties were named so that they
could be told what to do with monies they held or would
receive at the end of the case.  They were deemed to be
nominal parties.

Well, what about telling a party what to do
with securities.  Got examples of that, too, the *Prudential
Real Estate Affiliates* case, and the *Pesch* case, each
involving efforts to enjoin share transfers.  You've also got
the *Alberto Culver* case -- which isn't shares -- but it's
whether or not an intellectual property should be returned to
a party and taken out of the hands of the other party and of
the trustee who was holding it.  Those were all deemed to be
nominal parties.

What about the argument that the remedy flows
through the trustee.  That's an argument that's repeated a
number of times in the plaintiffs' papers.  I have found no
case that uses those words in describing what makes somebody
a real party or a nominal party.  And, in fact, one case --

1    which my friends representing Tristan had cited -- the *McNutt*

2    case, actually goes the other way, where the governor of a

3    state who sued, because technically in enforcing a sheriff's

4    bond -- it was technically in the governor's name that the

5    suit got filed -- the Court said that the state was a mere

6    conduit through whom the law afforded a remedy as to the

7    sheriff's bond. And as a mere conduit, it was a nominal

8    party. So if remedies flow through the trustee, if the

9    trustee is somehow a conduit through which money passes, that

10   doesn't make him a real party in interest.

11            Do you have to have the trustee as a party to

12   this case at all? Well, you know, all of their arguments are

13   based on speculation, that if you kept this case, and if you

14   entered a judgment in the favor of plaintiffs, that Wells

15   Fargo at that point somehow would refuse to acknowledge it,

16   that it somehow, despite your judgment if it got cash from

17   Tristan, it would still try to give it to my clients. I find

18   that inconceivable. Moreover, it is totally speculative and

19   totally contingent. If somebody tried to bring a declaratory

20   judgment action in front of you on that theory, you'd throw

21   them out on their ear, because it's completely unripe, it's

22   completely speculative, contingent, based on things that have

23   not happened yet, and for the same reason there's no basis

24   for Wells Fargo to be in the case right now.

25            How about the need to cancel securities,

another point they've cited.  Well, under the indenture Wells
Fargo doesn't even have any discretion.  It's just a purely
ministerial act.  If you or any court that had jurisdiction
over this were to order Tristan and the new noteholders to
direct Wells Fargo to cancel the new notes, under the
indenture Wells Fargo wouldn't have any right to refuse that.
All it does is the ministerial act of canceling it.  Those
kinds of ministerial acts -- under the *Lincoln Property
Company* case, a Supreme Court decision, those kinds of
ministerial acts don't make somebody a real party in
interest.

Now, the plaintiffs have taken language from
cases that talk about naming of the party who has a duty to
be performed.  That's from the *Rose v. Giamatti* case.  That
you're a real party if you're the one who has the duty to be
performed.  But I think, with due respect, that that language
has been misinterpreted.  It doesn't mean that you are a real
party just because it is useful to have you or just because
you can make it easier to provide a remedy.  The case law is
very clear on that.  And, in fact, if somebody wasn't useful
to have in the case to provide a remedy, they wouldn't be
defendants at all, let alone in the case as nominal parties.
In all of the cases where parties are holding property, and
they've been named as nominal parties so that the Court can
tell them who to give the property to at the end, those

parties have distribution duties, too, but they were still
nominal parties. That's true of all of the executors, all of
the trustees, all of the escrow agents, the indenture trustee
in the *Andrews* case, and the trustee in the *Walden v. Skinner*
Supreme Court case. They have duties but they're not duties
that are at issue in the case. That's what's important. And
unless they are at issues in the case, unless there is a
claim in the case that there was a violation of that duty, it
is not relevant to the cause of action and does not confer
subject-matter jurisdiction.

Now, there's another argument that the trustee
actually should be the plaintiff in this case. They come
right out and say it. But they allege that the reason that
the trustee isn't a plaintiff is because he has a conflict of
interest. I don't know that that's the case. I don't even
know if the trustee thinks that's the case. I don't think
anybody has asked the trustee; which is another point that
I'm going to get to. But that hardly shows that the trustee
is a real defendant in this case. What they need in order
for there to be subject-matter jurisdiction is a U.S. citizen
who is a real plaintiff and a U.S. citizen who is a real
defendant. Arguing that the trustee is a real party by
saying he should be a plaintiff doesn't solve the diversity
jurisdiction problem. it doesn't put a real U.S. citizen on
the defendant side of the equation, where there has to be

one.  And to the extent that that's the argument, the Supreme
Court's decision in the *City of Indianapolis* case is right on
point.  You don't line parties up based on whether the
plaintiff has decided to put them above or below the "v." in
the caption.  You line them up based on where their real
interests are.  So if that's the argument, then the trustee
should be viewed as a plaintiff.  It does not give you
jurisdiction.

What about the argument that the trustee has
fiduciary duties because, after all of the things that are
being complained about in this case happened, there was an
event of default, in that in July of 2010 Tristan failed to
make payments due on the notes.  Well, maybe the trustee does
or doesn't have heightened duties following that event of
default with respect to those circumstances.  But what does
that have to do with the Complaints in this case; all of
which focus on events that happened before that default
occurred and at a time where everybody agrees the trustee did
not have any such heightened duties, and at a time where not
only is there no argument that the trustee breached his
duties, there have been affirmative acknowledgements, at
least in the probate court by the plaintiffs, that they don't
believe the trustee violated any of its responsibilities.
Now, I was scratching my head.  The only thing I can figure
is that this was somehow an attempt to take advantage of the

1    distinction in the *Navarro* case that appears in some of the

2    cases between an active and a passive trustee.   But if you

3    look at those cases, those cases are situations where a court

4    tries to figure out whether to treat a trust as a party or

5    the beneficiaries as a party.   And it has to do, really, with

6    the legal stature of the entity.   So that in *Navarro*, for

7    example, it was a business trust.   It was not a formal

8    corporation.   Do you treat it like a corporation or do you

9    treat it like an unincorporated association, where the rules

10   are different as to whose citizenship you look to for

11   diversity purposes.   We don't have that issue.   Our issue

12   here has nothing to do with the corporate capacity of Wells

13   Fargo and whether, for example, we should be considering

14   Wells Fargo's citizenship to be all of its owners as opposed

15   to just Wells Fargo, or whether we should be considering all

16   the investors in my clients as funds as opposed to the funds

17   themselves.   That's not the issue we have.   The nominal party

18   issue we have here has nothing to do with the nature of the

19   entity who's been named but it's role in the case.   And

20   active versus passive has really nothing to do with that

21   unless you want to use those words to describe a situation

22   either where the trustee itself is actually suing to enforce

23   a right that belongs to the trustee or where the trustee is

24   being sued to defend against allegations that it has breached

25   a duty that it owes.   Now, if you want to use active and

1    passive labels -- I don't think that that's really what
2    they're intended for -- but those would fit the case law.
3    Those would be cases where the trustee is a real party.
4    That's not the case here.  The trustee has not sued, it has
5    not been sued, except to be named as a party against whom
6    relief is sought.  No wrongdoing, just a party that is there
7    for the purposes of relief.  And I don't believe under any of
8    those circumstances that you can properly view the trustee as
9    anything but a nominal party.  And since the trustee is a
10   nominal party, you don't have subject-matter jurisdiction
11   over this dispute.
12              Now, in addition, you don't have personal
13   jurisdiction over the defendants.  I'm going to obviously let
14   Tristan's counsel make the argument as to the facts that
15   relate to Tristan.  But I want to adopt one point that
16   Tristan made that actually we should have highlighted a
17   little more than we did, too, that there's two steps in any
18   personal jurisdiction analysis.  You first have to look at
19   the rules and see do the rules provide you with jurisdiction;
20   and second, if they do, you have to ask yourself, are the
21   rules consistent with due process limitations in giving you
22   the right to -- or -- purporting to give you the right to
23   exercise jurisdiction.  But you've got to start with the
24   rules.  And it's not enough to quote cases that say that,
25   "Well, the rules are consistent with the limits of due

1   process."  In some ways they are, but the rule doesn't

2   literally say:  "This court shall exercise personal

3   jurisdiction to the full limits of due process."  That's not

4   what it says.  It actually has tests and standards as to when

5   you can exercise jurisdiction.  And unless plaintiffs can fit

6   in one of those, you don't even get to the due process

7   issues.  And Tristan has done an able job of showing you

8   that, under Minnesota Statute 543.19, this doesn't fit into

9   the provision that would allow jurisdiction based on

10  transacting business in Minnesota, because the case law is

11  clear, sending letters, making telephone calls is not

12  transacting business.  It can't be based on the provision

13  that is based on committing an act in Minnesota that causes

14  injury because, again, the case law is clear, sending

15  letters, making telephone calls are not acts within the state

16  of Minnesota.  The only thing left is the provision that

17  deals with conduct outside of Minnesota that is alleged to

18  have caused injury in Minnesota.  There's no allegation here

19  that any of these plaintiffs is a Minnesota resident or that

20  any of the harms that they purport to have suffered was

21  experienced in Minnesota.  So the entirety of the argument

22  that plaintiffs have made on personal jurisdiction ignores

23  the statute.  It's entirely a due process argument, that if

24  the statute said otherwise, in their view they could have

25  personal jurisdiction, consistent with the constitution.  But

 1        you can't just step over the statute.  You've got to look at
 2        it.  And Tristan has laid this out in great detail in one of
 3        the footnotes in its brief.  It's absolutely clear, and I
 4        think it compels a determination, that there's no personal
 5        jurisdiction over either Tristan or the new noteholders.

 6                    Now, what about the due process issues, even if
 7        there were jurisdiction.  The same statute I was just
 8        referring to makes clear that only causes of action arising
 9        from the enumerated acts would support jurisdiction.  And the
10        case law on due process makes clear -- nobody is alleging
11        here that we're subject to general jurisdiction if you're
12        talking about specific jurisdiction.  The claim asserted
13        against you has to be based on the contacts that you
14        allegedly had with the state.  Well, in that regard, it's
15        very important in the case of my clients to look at what the
16        claim is, because the plaintiffs don't distinguish.  They
17        just talk about the authentication of the notes, the
18        affiliate provisions, et cetera.  The breach-of-contract
19        claim, which is Count I of the Complaint, is asserted only
20        against Tristan.  It is not asserted against my clients.  My
21        clients were not parties to that contract.  We can't be
22        accused of breaching the contract.  The claim against my
23        clients is that they bought notes from Tristan at such a low
24        price that in plaintiffs' views that constituted a fraudulent
25        transfer.  Now, that has nothing to do with any of the events

that they say took place in Minnesota.  Tristan issued notes
to my clients and it did not subordinate that obligation to
any other obligation.  It took payment from them overseas,
they were issued to my clients overseas.  And that
transaction happened sometime in June of 2009.  That's the
transaction that they claim injured them.

Now, the other events that they complain about
had to do with making those notes subject to the indenture in
this case, the authentication, when Tristan sent them to the
trustee here for authentication, or had to do with later
exercises of rights under the indenture, my clients' request
for a merger of the notes.  And they've tried to say that
that's somehow all part of the same scheme.  But it's not.
First of all, it's not a scheme.  It's supposedly a
fraudulent transfer that they're complaining about.  It is
the transfer, the issuance of the notes to my clients in
exchange for payment that they say was too low.  That is the
event of which they complain.  None of the Minnesota contacts
have anything to do with that particular claim; whether it
gave me additional rights under the indenture; whether they
are happy with my exercising rights under the indenture;
whether they think that Tristan would have breached the
indenture by issuing the notes without making them part of
the indenture is all beside the point.  The actual claim is
based on something that was finished and accrued before there

1    was any contact with Minnesota of the kind that they're

2    alleging supposedly took place on behalf of my clients.   So

3    it is not possible that that claim arises out of contacts

4    with Minnesota.   It obviously arose out of transactions that

5    admittedly happened elsewhere.   Furthermore, even if those

6    Minnesota contacts were to be taken into account, they're

7    just not enough.   They're far too attenuated, to use the

8    words of the case law.   We don't have an allegedly affected

9    Minnesota resident here.   All we have are a few isolated --

10   this is the maximum even alleged -- a few isolated letters

11   and telephone calls to the trustee's office to perform a few

12   ministerial duties here.   That's it.   All of the terms of

13   these transactions were negotiated and closed overseas

14   between foreign parties under documents, in these particular

15   transactions, that were governed by UK law.   There's nothing

16   about that that creates jurisdiction over that alleged

17   fraudulent transfer claim here in Minnesota.   And while I

18   always get a headache reading personal jurisdiction cases

19   because, frankly, it always seems to me they're thoroughly

20   inconsistent with each other, and because I don't think the

21   Supreme Court, quite frankly, has done a very good job of

22   setting forth criteria that are capable of being easily

23   applied.   They're too vague.   But where you get into trouble,

24   and where you get the greatest amount of disagreement in the

25   cases, is where you have a local resident that is party to a

1  loan or a contract with somebody in another state. That's

2  where you get completely inconsistent results about is that

3  enough, is that enough, and where it's the local resident

4  who's actually suing. But we don't have that here. We don't

5  have any Minnesota residents here who are suing. Okay? And

6  the trustee is just a nominal party, as I've already, at

7  probably too much length, gone through. So we don't have

8  that situation that generates the kind of margins in the case

9  law about, well, when are these contacts enough. I don't

10  know of any case like ours, where the letters and phone calls

11  that have been alleged are enough for somebody to say that

12  that's enough to make it fair to take one fund that's in

13  Cyprus and another fund that's in the Cayman Islands and a

14  Kazakh Oil Company-related entity that's incorporated in the

15  BVI and to bring them into Minnesota. I don't know of any

16  case that supports that proposition. And the allegation that

17  you should do that is directly contrary to the Supreme

18  Court's admonition in the *Asahi* case, that you've got to be

19  really careful about dragging foreign parties into United

20  States courts based on isolated contacts.

21          One last point on this. One of the things that

22  I don't particularly like in the phrasing of a lot of the

23  jurisdictional tests is the standard about whether it's

24  reasonable to expect that you will be haled into court.

25  Because I think sometimes courts interpret that as if it's

like a proximate cause test, or something, is it foreseeable.
Could you in your wildest dream imagine that somebody might
do it. That's not how the Supreme Court applies that test
and it's not how you should apply that test. It's not about
whether it is totally unthinkable. It is: "Is it fair"?
Would you reasonably expect to be haled into court. In light
of due process and in light of the nature of the claim
against you and the amount of contact with the forum state,
would a fair-minded person say that it's right for this court
to exercise jurisdiction. I think I can fairly say that the
parties to this transaction would have been shocked if you
told them at the time of the transaction that somebody would
allege that this court would be the place where disputes
about that transaction were to be considered.

Now, the last point -- well, I should back up
one second. There's also an argument in the plaintiffs'
papers that Tristan's contacts with the trustee about the
authentication of the notes should be attributed to my
clients. Again, I don't think those have anything to do with
the particular claim asserted against my clients. I think
they're isolated and attenuated contacts, anyway. But under
your own decision in the *AXA Equitable v. Paulson* case, you
don't attribute Tristan's contacts to my clients. You look
at each party's own contacts, at least where there isn't a
direct ownership relationship or a direct agency

1    relationship.  Where you have people who are arm's-length

2    parties to each other in a deal, you don't attribute their

3    contacts to each other.

4                Now, the last relevant point that I need to go

5    over is our participation in the probate court action.  That

6    was the only ground alleged in the Complaint for personal

7    jurisdiction over my clients.  Only two of my clients

8    participated, actually, in that action.  Vision did not.

9    And the other new noteholder who's been named, Sputnik, who

10   hasn't appeared -- I don't even know if they've been sued,

11   actually -- if they've been served.  But they also didn't

12   appear in the probate court.  Finding that that would give

13   rise to personal jurisdiction I think would actually be

14   contrary to what is now the final decision of the probate

15   court itself, which held that even it did not have personal

16   jurisdiction over us in that case, because it was just an

17   interim proceeding.  That decision is now binding on the

18   plaintiffs.  They can't challenge it here.  They were parties

19   to that case.  The issue was decided against them.  So

20   participation in the probate court didn't give rise to

21   personal jurisdiction, even there, let alone here.  But even

22   if we had submitted the personal jurisdiction in the probate

23   court that would have nothing to do with this court's

24   jurisdiction.  The case law is clear that the only times that

25   that has been viewed as supporting jurisdiction is where the

1        party is the plaintiff.  We were not the plaintiff in the
2        probate court action.  We just responded to the fact that the
3        trustee brought a proceeding.  Furthermore, the whole theory
4        of those cases is if you as a plaintiff have elected to ask a
5        court in a jurisdiction to resolve a dispute on a particular
6        set of operative facts, you are -- the word "estoppel" isn't
7        used, but that's, in effect, what it is.  You are estopped
8        from saying that that court isn't an appropriate place to
9        decide those facts.  Well, all we did in the probate court
10       was say that all these claims that plaintiffs want to
11       adjudicate couldn't be decided here.  We fought tooth and
12       nail against the idea that they were in the slightest bit
13       relevant to the merger of the notes, which is what was at
14       issue.  There is absolutely nothing about our conduct in the
15       probate court that could reasonably be interpreted as an
16       acknowledgement that any court in Minnesota was an
17       appropriate place to resolve the issues that the plaintiffs
18       are claiming here.  It just would defy common sense.
19                  I'm going to allow Tristan to handle its own
20       jurisdiction argument, obviously, and Tristan will handle the
21       argument on forum non conveniens.  But I believe Tristan is
22       right that there's no jurisdiction over it and there's no
23       jurisdiction over my clients.  Another reason to dismiss the
24       case, then, would be that you don't have jurisdiction over
25       necessary parties.  Your decision in the *AXA* case, you quoted

1     another case for the proposition that it is a firmly rooted

2     principal that if you challenge the validity -- in that case,

3     a lease, I think it was, or an instrument or an agreement --

4     all of the affected parties have to be named, and they are

5     all indispensable.  And that's exactly the situation that we

6     have here.  There's an argument in plaintiffs' response that

7     if you were to exercise jurisdiction over Tristan that would

8     be enough to protect our interest.  That can't possibly be

9     the case.  The relief that they are seeking against my

10    clients is they want my clients to return all of the notes to

11    Tristan and to let Tristan off the hook for those notes.  I'm

12    sure Tristan would probably like to be off the hook for those

13    notes.  It is not possible that Tristan would be the

14    appropriate party to safeguard my clients' interests in that

15    particular dispute.  There's also an accusation that they

16    don't need all the new noteholders because they are joint

17    tortfeasors.  Well, there's a couple things wrong with that

18    argument.  Fraudulent transfer law in some senses is treated

19    as a kind of tort, or sometimes referred to that by the

20    courts.  But it actually is not a tort.  It is a statutory

21    action that exists for the benefit of creditors.  And in this

22    particular context, where what plaintiffs are saying is that

23    there's joint and several liability, I don't know of any such

24    thing under fraudulent transfer law.  You are liable under

25    fraudulent transfer law possibly to return the transfers that

1    you received.  Because all that fraudulent transfer law does

2    is either undo the transfer itself or require the transferee

3    to pay damages for the value of what it got if it paid too

4    little in the first place.  There's no such thing as joint

5    and several liability.  Absolutely not.  I've been litigating

6    fraudulent transfer cases for a long time.  I know of no such

7    thing.  But, also, it's an odd argument to make, because

8    their entire argument on subject-matter jurisdiction depends

9    on saying to you that:  "Well, damages isn't really what

10   they're looking for."  Frankly, it is.  And, frankly, it's

11   all they would really need.  But it depends on themselves

12   saying to you:  "Well, that's not what we're really looking

13   for.  We have to have some kind of other remedy that isn't

14   just damages but that actually cancels the notes."  Well, if

15   you're going to look at it that way, then very clearly all of

16   the parties to that note transaction, all of the holders of

17   those notes and the party that issued to those notes, all

18   would be indispensable to that claim.  So if you're going to

19   rely on that as your explanation for why Wells Fargo has to

20   be in the case, you can't just toss it aside when you get to

21   the necessary party issue.  If that's what you're claiming,

22   and if that's what the gist of your action is, then very

23   clearly these are necessary parties and you can't proceed

24   without them.

25                    Now, there's an additional reason why the

1    claims need to be thrown out and that's the failure to comply

2    with the no-action clause.  As we've pointed out, at least

3    one of the breaches that they allege about the affiliate

4    point is not even an event of default, unless the trustee or

5    the holders of 25 percent of the notes provide a Notice of

6    Default with a demand for compliance.  There's no allegation

7    that ever happened.  And plaintiffs didn't even respond to

8    that.  Even if there were an event of default, the proper

9    remedy is to petition the trustee to file suit.  Well, what

10   do they say?  They say, "Well, the suit's against the new

11   noteholders."  The trustee can't sue the new noteholders.

12   Well, wait a minute.  The first cause of action is against

13   Tristan, not the new noteholders.  It alleges breaches of

14   contract by Tristan.  Where's the conflict of interest there?

15   There's none.  There's absolutely no excuse whatsoever for

16   not having complied with the no-action provisions on that

17   point.  Furthermore, as to whether the provision applies, you

18   can say all you want about what you think the purposes of the

19   provision are.  It's worded very clearly.  It says:

20   "Noteholder may take any action" -- any action -- "to seek

21   any relief with respect to the notes or the indenture, except

22   by complying with these provisions."  The case law in New

23   York is very clear that that provision is strictly construed,

24   meaning it's strictly construed.  The words are enforced in

25   accordance with what they say.  In the *Drage* case that we

1    cited, D-r-a-g-e -- I'm sure I butchered the pronunciation --

2    there was a challenge to a consent solicitation, where an

3    amendment to a loan agreement had been submitted for

4    approval, and parties who provided consents were actually

5    given payments in return for their consents.  And some of the

6    noteholders who didn't give consents wanted to challenge

7    that.  They alleged that it would be futile to ask for the

8    trustee to go along, because the trustee had cooperated in

9    the original deal, and also futile to ask for the consent of

10    the other noteholders, because they had already agreed to it.

11    They even accepted payment for it.  The Court threw out the

12    case.  The futility had nothing to do with it.  The rights

13    that were being asserted were subject to contractual

14    limitations.  And those limitations were not complied with,

15    so the Court threw it out.  The Court did the same thing in

16    the *Feder* case.  And, then, in the *Feldbaum* case, where

17    there's a -- which has been cited by the plaintiffs for the

18    proposition that you should interpret this provision as if it

19    said that it only applies if the action is for the benefit of

20    every noteholder.  That's what they cite it for.  The

21    *Feldbaum* case doesn't say that at all.  It cites the

22    convenience of having a single party enforce remedies that

23    are ratably for the benefit of everyone as an additional

24    purpose.  But, actually, it says very explicitly that the

25    main purpose of the provision -- the main purpose -- is to

bar suits that don't have majority support.  I mean it says
that explicitly.  Now, here, they don't have a majority of
the bonds.  They claim that they have somewhere around 35
percent -- I don't remember the exact figure, I'm afraid --
of the existing notes.  I think that comes out to somewhere
around 28 percent of all the notes.  Thirty-six percent of
the existing notes and 28 percent of all the notes.  Well,
that's not an excuse to avoid the no-action provision.

Finally, I want to talk very briefly about the
*Cyprus* decision on which plaintiffs rely, where the Court
excused compliance with the no-action provision.  I urge to
you read that decision because it is, to be honest, a little
hard to figure out exactly what the Judge is saying.  But
there's a couple of important differences.  In that
particular case -- it was a Delaware decision -- the Chancery
Judge also said that the trustee was being sued because the
trustee had failed to enforce a provision in a loan agreement
that required 80 percent of the noteholders to consent to an
amendment to the loan agreement.  So he cited cases saying
that the no-action provision doesn't apply where you're suing
the trustee.  He also said that there was a lot of force to
the argument that the action in that case was to enforce that
provision of the note agreement and not to enforce any
provision of the indenture.  We don't have any of those
situations here.  And what the Judge basically said is, "If

1    you've got a situation where you have to have 80 percent

2    approval, I'm not going to say that that can only be enforced

3    with the consent of more than half of the people.  It doesn't

4    make sense."  That's what he said.  Well, you do have

5    conflicting provisions there, but we don't have those in our

6    case.  You don't have any of these exceptional circumstances

7    that would excuse a compliance with the no-action provision.

8            The last points I want to cover are just our

9    Motions to Dismiss two causes of action that are denominated

10   as separate causes of actions but are really just

11   descriptions of relief being sought, not of actual separate

12   causes of action.  The first is equitable subordination.

13   Now, the case law that we have cited makes clear that that's

14   a bankruptcy concept.  The plaintiffs have cited some cases

15   from New York involving lienholders.  And the doctrine in New

16   York -- and many other states, I assume -- is if you are the

17   holder of a senior lien and you modify -- excuse me -- the

18   debt that is secured by your senior lien, you've got to have

19   the consent of the junior lienholder if you're affecting the

20   junior lienholder; and if you don't, then you give up your

21   senior lien position as to the additional amount of the debt

22   or whatever the effect is.  And that is called "equitable

23   subrogation."  Now, we've cited the *Gaymar Industries* case --

24   and I urge you to read that -- because it explains and cites

25   examples of places where courts have sometimes used the words

"equitable subordination" where what they are really talking
about is "equitable subrogation."  And the cases that the
plaintiffs cite are exactly that situation.  Only one of them
actually uses the words "equitable subordination," but it was
in what I have described as the "equitable subrogation"
context.  It was where a senior lienholder agreed to a
modification without getting the consent of the junior
lienholder, and where the junior lienholder as a result was
deemed equitably subrogated to the senior lien position.
That is different from equitable subordination.  Nobody is
claiming junior, senior lien positions here, or anything of
the kind.  But even if any of that were wrong, even if it was
all wrong, what plaintiffs have said is that they think that
equitable subordination is a remedy under New York fraudulent
transfer law.  Well, you've already got a fraudulent transfer
claim.  Equitable subordination, if you think it's a remedy,
then, fine, assert it as a remedy.  It is not a separate
cause of action.  It doesn't belong in the Complaint as a
separate cause of action or to be pursued as allegedly a
separate cause of action.  And the same is true of
injunction.  We've cited legions of cases.  Injunction is not
a cause of action.  It's just a remedy.

I'm going to stop there, except for one last
point, that plaintiffs in their papers accused us of
admitting that there was some kind of merit to the rest of

1    the claims just because we didn't make them subject to the

2    Motion to Dismiss.  We didn't make them subject to a Motion

3    to Dismiss just because of the limitations in the rule about

4    when things can be subject to a Motion to Dismiss.  I assure

5    you we dispute the validity of those claims to the utmost.

6              Thank you, your Honor.

7              THE COURT:  Thank you very much.

8              MR. ULLMAN:  Good afternoon, your Honor.

9              THE COURT:  Good afternoon.

10             MR. ULLMAN:  Your Honor, this case does not

11   belong in this court.  We have put forth in our briefs a

12   number of independent reasons why that's so.  Those points

13   have been discussed extensively.  What I'd like to do now is

14   just highlight a few points, with particular emphasis on the

15   issues pertaining to Tristan and, also, amplify a few things

16   that Mr. Wiles said.

17             With respect to subject-matter jurisdiction, we

18   agree with everything that Mr. Wiles said.  The short answer

19   is that there is no subject-matter jurisdiction here.

20   Clearly Wells Fargo is a nominal party.  It has no interest

21   in the outcome of this litigation; it has no stake in the new

22   notes that are at issue here; it has not been accused of any

23   wrongdoing by the plaintiffs.  Concededly it has only been

24   named for the purpose of facilitating relief if the

25   plaintiffs prevail, which is a classic hallmark of a nominal

party. And as we've pointed out in our reply memo, there's
no real issue that would even require the trustee to be here.
Plaintiffs now say that what they seek is the relief of
cancellation. Well, that would require first for the Court
to compel the new noteholders to submit a cancellation
request to Tristan. And, then, if Tristan didn't follow up
on that, it would require the Court to compel Tristan to
submit an instruction to the trustee. At that point, the
trustee would be required to cancel the notes. It wouldn't
have any discretion in the matter. So there's no practical
reason for the plaintiffs to even want the trustee to be
named, to be present in this action. And that only further
underscores the fact that their purpose in naming the trustee
as a defendant here was for strategic purposes only and not
because the trustee has any actual interest in the outcome of
this case. In fact, the most that the plaintiffs can say is
that if they prevail and if the requisites for cancellation
that I've gone through are not complied with, then there
exists a bare possibility that the trustee potentially,
possibly, conceivably could refuse to comply with its duties
under the indenture. But as was made clear in the *Rose v.*
*Giamatti* case, which the plaintiffs rely on, the mere
possibility that a named defendant might in the future commit
a breach is not enough to make that party a real party, and
in this case, a real defendant in interest. Ultimately, when

1    you sort through the papers, what you'll see is that the

2    plaintiffs cannot, and do not, cite a single decision holding

3    that a party in the position of Wells Fargo here is anything

4    more than a nominal party.  And we've discussed the case law

5    extensively and I'm not going to repeat that discussion, but

6    I would like to call the Court's attention in particular to

7    the *Prudential* case on which the plaintiffs rely.  We agree

8    that that case is on point, but it supports our position, not

9    the plaintiffs'.  In the Prudential case -- which is a Ninth

10   Circuit 2000 decision -- certain named defendants held shares

11   of stock.  Those defendants had previously wanted to keep the

12   stock for themselves.  I believe there was an arbitration

13   proceeding which held that those particular defendants

14   weren't entitled to it.  And, then, the federal court action

15   arose.  And the question in the federal court action was

16   who's going to get the stock and it was either going to be

17   the plaintiff or the co-defendant.  And the only question

18   before the Court was which of those two parties was going to

19   get the stock.  Now, the parties that held the stock had

20   previously sided with the co-defendant and acknowledgedly

21   wanted the co-defendant to win.  They had a preference for

22   the co-defendant to be the victor in the litigation, but

23   they, nonetheless, acknowledged that they'd have to turn over

24   the stock to whoever the Court held was entitled to have it.

25   And on those facts, the Court held that the parties holding

1     the stock were nominal parties for diversity purposes.  And

2     in this case the trustee's position is, if anything, even

3     clearer.  Like the nominal parties in the *Prudential*

4     decision, the trustee has no interest in the litigation.  If,

5     at some point in the future, it is called upon to act, if the

6     Court tells it to do something or if the law requires it to

7     do something, it's made clear that it will do whatever the

8     Court or the law requires.  And in sharp contrast to the

9     parties who were held nominal in the Prudential case, the

10    trustee has no preference as to who wins or who loses here.

11    You heard counsel for the trustee say last time that they

12    don't care.  They're even concerned about sitting on that

13    side of the courtroom because they don't want any impression

14    that they're favoring one side or the other.  So on the law

15    and the facts, your Honor, Wells Fargo clearly is a nominal

16    party only.  It's presence cannot be considered in

17    determining whether diversity jurisdiction exists.  Without

18    Wells Fargo, there is no diverse U.S. citizen on the

19    defendants' side of the caption.  Accordingly, there's no

20    diversity jurisdiction and this action must be dismissed.

21              With respect to personal jurisdiction, your

22    Honor, the plaintiffs, as you know, have conceded that there

23    is no general jurisdiction over Tristan.  So the question is

24    whether this court has specific personal jurisdiction over

25    Tristan.  As we all know, for specific personal jurisdiction

to lie, the claims alleged have to arise out of, or relate
to, Tristan's contacts with the forum state, Minnesota. And
that test is not, and cannot be, met here from either a state
law or a constitutional perspective. And I'm going to touch
on the state law issue first. As Mr. Wiles has observed,
while the plaintiffs clearly, and for obvious reasons, prefer
not to focus on it, the fact is that there is a state
long-arm statute that discusses the circumstances in which a
non-resident can be subject to Minnesota jurisdiction in
diversity cases, and the requisites of that statute have to
be met. So the question is what, then, does the long-arm
statute say. Well, the only prong of the long-arm statute
that could even arguably apply here is Section 543.19(d),
which allows the assertion of jurisdiction over a person who,
quote, commits any act outside Minnesota causing injury or
property damage in Minnesota. Now, plaintiffs certainly have
alleged wrongful conduct that took place outside of
Minnesota, but there's no allegation and no prima facie
showing of any resulting injury or property damage that
occurred in Minnesota, as the long-arm statute requires.
And, clearly, there can't be, because no plaintiff is a
Minnesota resident. Not a single one. Now, plaintiffs try
to avoid the import of the long-arm statute by arguing that
it extends to the limit of due process so that the actual
terms of the statute don't really matter. Well, the long-arm

1    statute does matter, it does exist, and its terms have to be

2    met under the law.  We've cited cases in our briefs,

3    including federal cases, dismissing for lack of jurisdiction

4    based on the long-arm statute.  In the *Digi-tel Holdings*

5    case, which is 89 F.3d 519, an Eighth Circuit 1996 decision,

6    the Court explicitly stated that for personal jurisdiction to

7    exist "the facts presented must satisfy the requirements of

8    the forum state's long-arm statute."  So while it may be true

9    that the long-arm statute is co-extensive with due process,

10   what that really means is that the terms of the long-arm

11   statute extend the limits of jurisdiction to the bounds of

12   what due process allows.  But it is equally true that where

13   the terms of the long-arm statute cannot be met then, under a

14   due process analysis, you've exceeded what's permissible

15   under the Constitution.  So in this case, because the

16   plaintiffs cannot come within the terms of the long-arm

17   statute, cannot make a showing of jurisdiction under the

18   state law, the analysis can properly end there.  There's no

19   personal jurisdiction over Tristan under the state long-arm

20   statute and this alone requires dismissal of the claims

21   against it.

22          Now, to the extent that the Court chooses to

23   consider the jurisdictional analysis from a constitutional

24   perspective -- which it doesn't have to do -- the outcome is

25   no different.  On the one hand, plaintiffs' claims arise from

1    what they contend was the wrongful sale and issuance of the

2    new notes which took place overseas in 2009.  And, also,

3    although they don't really focus on it, in Count IV of their

4    Complaint they allege that in 2010, I believe it is, Tristan

5    failed to make payments that were due to the existing

6    noteholders under the terms of the existing note.  The

7    existing noteholders, of course, none of whom are Minnesota

8    residents.  So that's what the claims are.  That's what they

9    arise out of it.  On the other hand, the contacts that the

10   plaintiffs allege between Tristan and Minnesota have nothing

11   to do with those claims.  So what are the contacts?  Well,

12   first, the plaintiffs point to some marketing activities for

13   the existing notes -- not the new notes, the existing notes

14   -- that plaintiffs say took place in 2006 and 2007 and

15   included, but were not focused on, some potential purchasers

16   in Minnesota.  Now, those asserted activities, which

17   concerned the existing notes and took place at least three

18   years before, before the new notes were even issued, clearly

19   have absolutely nothing to do with the new notes or the

20   wrongful conduct relating to those notes, to their issuance

21   and sale, that the plaintiffs allege occurred in 2009.  And

22   those asserted activities in 2006 also have nothing to do

23   with the plaintiffs' claims for repayment, since the

24   plaintiffs are not Minnesotans and did not purchase the

25   existing notes in this state.  Second, plaintiffs point to

1    various administrative duties that the trustee, who, of

2    course is located in Minnesota, assumed in connection with

3    its obligations as trustee under the indenture. But the

4    plaintiffs' claims don't arise because the trustee performed

5    any administrative duties in Minnesota. Those duties were,

6    at best, at best, ancillary to the indenture, and have

7    absolutely nothing to do with the claims that the plaintiffs

8    have asserted against Tristan. And equally important, those

9    asserted contacts, the activities, the administrative

10   actions, the ministerial activities by the trustee in

11   Minnesota, do not show any activities by Tristan in this

12   state. In the *Scullin Steel* case -- that's an Eighth

13   Circuit, 1982 decision -- an informed seller sued a

14   non-resident buyer for breach of contract. In the course of

15   their dealings, the parties had engaged in telephone and mail

16   communications, and there was payment and delivery of goods

17   under the contract that had been made in the forum state.

18   And this was a case where the plaintiff had, in fact,

19   manufactured the goods in the forum state. And in holding

20   that the Court lacked specific personal jurisdiction, it

21   wrote: "It is the defendant's contacts with the forum state

22   that are of interest in determining if in personam

23   jurisdiction exists, not its contacts with a resident."

24   Regardless whether the trustee did anything administratively,

25   as it clearly did in connection with the indenture in

1   Minnesota, Tristan didn't do anything.  Tristan's contacts

2   with Minnesota are far less than those that were held

3   constitutionally inadequate in *Scullin*.  And likewise, to the

4   extent that the plaintiffs are contending that specific

5   jurisdiction exists because Tristan from time to time sent

6   communications into the state, gave instructions to the

7   trustee concerning the performance of its administrative

8   duties, those communications clearly are not what give rise

9   to the plaintiffs' claims.  The law is clear that merely

10  contracting with an in-state party is insufficient to support

11  jurisdiction, that's among other things, the Supreme Court's

12  decision in the *Burger King* case.  And the law is also clear

13  that merely sending written communications into a state is

14  constitutionally insufficient to support jurisdiction.  And

15  that's made clear in a host of cases we've cited in our brief

16  from the Eighth Circuit and the District of Minnesota,

17  including the *Mountaire*, *Scullin*, *Austad*, and other cases.

18  And they're all in the briefs.

19           Third, the plaintiffs refer to the

20  authentication instruction that Tristan sent to the trustee

21  following the issuance of the new notes by Tristan.  But,

22  again, that is simply a written communication sent from

23  outside the state and is constitutionally insufficient for

24  this reason.  And, further, it was written after the sale and

25  issuance of the new notes took place.  It was written after

1    the event that the plaintiff says give rise to its claims.

2    And, thus, for jurisdictional purposes, it's wholly

3    irrelevant. The claims that the plaintiffs are asserting

4    here against Tristan arise, again, from the sale and issuance

5    of the new notes outside the state, and from Tristan's

6    failure to make a payment -- the alleged failure -- on the

7    existing notes. All of that took place outside of Minnesota,

8    and none of that was in any way based on Tristan sending the

9    authentication instruction to the trustee.

10    On the law, your Honor, the plaintiffs have

11    conceded that they cannot meet the effects test that was set

12    out in the *Calder v. Jones* decision of the Supreme Court,

13    which can support jurisdiction when there's an alleged

14    wrongful act outside the state that causes an injury to a

15    plaintiff inside the state. So that leaves the plaintiffs on

16    the jurisdictional front with having to show acts by Tristan

17    in the state that gave rise to, or relate to, their claims

18    such that Tristan, who, of course, is a foreign defendant, a

19    BVI company, should reasonably have expected to be sued here

20    in Minnesota. And as Mr. Wiles pointed out, in assessing

21    that issue, the Court needs to keep in mind that Tristan is

22    indeed a foreign company and is subject to the special

23    considerations that the Supreme Court articulated in the

24    *Asahi* decision that demand prudence and restraint when a

25    foreign defendant is sued in the United States.

1          So for all the reasons I've gone through, and

2    as we've set out in the briefs, the plaintiffs here cannot

3    come even remotely close to meeting their burden of making

4    out a prima facie showing that jurisdiction exists.  And this

5    indeed can be seen from the cases that they cite.  When you

6    read the cases that are cited by the plaintiffs, they all

7    have two things in common, the first is that they all involve

8    a forum plaintiff.  Of course, here, not a single plaintiff

9    is from this state.  And second, all of the plaintiffs' cases

10   involve a breach of contract between the forum plaintiff and

11   an out-of-state defendant, where the defendant performed in

12   the state or otherwise conducted activities such as

13   soliciting the plaintiff or breaching the contract in the

14   state.  So in those cases there is no issue that jurisdiction

15   was present.  It was.  Here, on the other hand, none of the

16   plaintiffs is from Minnesota, which is the forum state.  The

17   claims do not arise out of a breach of contract between

18   Tristan and a Minnesotan plaintiff, and there is no

19   allegation of a breach of a contract involving the

20   solicitation or performance or breach by Tristan in

21   Minnesota.  So plaintiffs' own cases only further confirm

22   what we believe was already clear, that specific personal

23   jurisdiction over Tristan does not exist.

24          With respect to the Rule 19 motion, the failure

25   to join necessary parties, I don't have much to add to what

1    was already said by counsel for the new noteholders.

2    Clearly, plaintiffs are seeking to affect the rights of all

3    the new noteholders and, indeed, to cancel their rights under

4    the new notes. In those circumstances, even if there were

5    jurisdiction against Tristan -- which there isn't, because

6    there is no jurisdiction over any of the new noteholders --

7    proceeding with this action would violate their rights, I

8    believe it's constitutionally impermissible, and certainly

9    impermissible under the strictures of Rule 19.

10            With respect to the no-action clause, again,

11   I'm just going to add a few things to what counsel for the

12   new noteholders said. This clause applies to all of the

13   claims that have been brought against Tristan, with the

14   exception of Count IV, which is the one for nonpayment of

15   the existing notes held by the existing noteholders. I

16   don't believe that that particular claim is subject to the

17   no-action clause, but all of the other claims against Tristan

18   are. Contrary to what the plaintiffs would like the Court to

19   believe, this type of provision, a no-action clause, such as

20   the one contained in 6.06 of the indenture, is not mere

21   boilerplate. It serves an important purpose and that

22   purpose, as described by the American Bar Foundation, is the

23   purpose of preventing individual holders from bringing

24   independent lawsuits for unworthy or unjustifiable reasons.

25   It was said a little differently in the *Feldbaum* case in

which the plaintiffs rely.   The *Feldbaum* court said that a
no-action clause protects against, quote, the exercise of
poor judgment by a single bondholder or a small group of
bondholders who might otherwise bring a suit against the
issuer that most bondholders would consider not to be in
their collective economic interest.   Well, that's exactly the
purpose that's served here.   As Mr. Wiles has gone through,
when you look at the allegations concerning the aggregate
amount of existing notes and new notes, and the 150 million
in notes that the plaintiffs say they hold, the existing
noteholders have about 79 percent of the total of all the
notes -- I'm sorry -- the existing notes are about 79 percent
of the total of all notes.   And the plaintiffs themselves
hold about 36 percent of the existing notes and 28 percent of
the notes as a whole.   Thus, either way you look at it, the
plaintiffs are a minority seeking to assert claims that even
the majority of existing noteholders apparently find baseless
and not in their collective economic interest.   Their
reliance on the *Feldbaum* case, the Delaware Chancery
decision, is misplaced.   In *Feldbaum*, the Court noted three
exceptions to a no-action clause, the first is where the
trustee itself is accused of wrongdoing.   That, of course, is
not the case here.   The second is a situation where the
noteholders allege that they were fraudulently induced to
purchase the notes so that the fraudulent inducement would

1    include inducement -- or -- the fraudulent inducement to sign

2    onto the no-action clause.  That's not the case here, either.

3    And the third exception noted by *Feldbaum* is where the claims

4    were brought by persons who used to be noteholders but had

5    since sold out and were not presently noteholders, meaning

6    that the trustee wouldn't be in a position to represent their

7    interests.  And that's not present here either.  So the three

8    exceptions that were recognized in the *Feldbaum* case, the

9    only three exceptions -- the application of the no-action

10   clause that the Court in *Feldbaum* recognized -- do not apply

11   as regards Tristan.  Nor is there any argument that asking

12   the plaintiffs to comply with the no-action clause would be

13   futile.  As the cases that plaintiffs cited make clear,

14   futility can be invoked as an excuse to compliance with a

15   no-action clause only if the trustee itself has already been

16   accused of misconduct or has already stated its substantive

17   agreement with the action being challenged.  That hasn't

18   taken place.  Or it can be held futile if the party seeking

19   to avoid using the no-action clause holds all the bonds --

20   which, obviously, it wouldn't make any sense.  But that's not

21   the situation here.  On the contrary, the plaintiffs are just

22   the minority.  And, finally, regardless of the merits of the

23   contention that the trustee would be put in a conflict-of-

24   interest position if it had to assert claims as against the

25   new noteholders -- which we don't really see -- that argument

on its face is inapplicable, has absolutely no application to
the claims that the plaintiffs have asserted against Tristan.
So under the plain terms of the contract -- or -- the plain
terms of the indenture, the no-action clause applies to all
of the claims against Tristan except for Count IV, and that
all of them must be dismissed for failure to state a claim.

Finally, I'm going to touch briefly on our
position on forum non conveniens.  I'm not going to dwell on
it at length, because I think the proposition is fairly
self-evident, because I think the claims against Tristan
alternatively, if the case is not dismissed on other grounds,
should be dismissed on grounds of forum non conveniens.
Tristan is a British Virgin Islands, BVI, company.  The BVI
is an alternative available forum.  The BVI, as we've pointed
out in our reply papers -- and this is available from the
U.S. government, and the CIA fact book -- it's on the Web --
follows English law.  So there can't be any contention that
they wouldn't have a remedy in a BVI court.  And it's equally
clear that, at least as regards Tristan, Minnesota is not a
conveniens forum under the standards that this court must
look at in assessing the forum non argument.

Looking at the private factors, Minnesota
plainly is not convenient for Tristan, which doesn't do any
business in the U.S., and certainly has no presence in
Minnesota.  It's not even convenient for the plaintiffs.

1    None of them come from Minnesota.   The action was filed here

2    only because the trustee is here, and the trustee is just a

3    nominal party not accused of any wrongdoing.

4         For the claims that are asserted in this

5    action, there are no witnesses in Minnesota.   Subpoena power

6    of this court does obviously not extend to witnesses outside

7    the state or overseas.   And as the indenture itself, I

8    believe, noted -- or -- maybe it's one of the associated

9    documents -- we've pointed it out in our papers, there's at

10   least a question whether any judgment rendered in this state

11   would be enforceable overseas.

12        Looking at the public factors, the Minnesota

13   body public clearly has no interest in a Minnesota court

14   hearing claims brought by non-Minnesota plaintiffs against a

15   BVI company, based on alleged misconduct, that all took place

16   outside of Minnesota and is not governed by Minnesota law.

17   So we don't think the plaintiffs have any viable claim

18   against Tristan.   But to the extent that they're seeking to

19   assert one anyway, it does not belong here, and there is no

20   impediment to plaintiffs bringing a claim against Tristan in

21   the BVI.   And, therefore, your Honor, if the action against

22   Tristan -- if the claims against Tristan are not dismissed on

23   other grounds, as we think they should be, they should be

24   dismissed under principles of forum non conveniens.

25        Thank you, your Honor.

1         THE COURT:   Thank you.   We're going to take
2    about 15 minutes.   We're going to come back at about three
3    o'clock.
4         THE CLERK:   All rise:
5         (Court stood in recess at approximately 2:50
6    p.m., and reconvened at approximately 3:05 p.m.).
7         THE COURT:   Mr. Fisco:
8         MR. FISCO:   Good afternoon again, your Honor.
9         THE COURT:   Good afternoon.
10        MR. FISCO:   The parties agree on one thing,
11   there are essentially two issues regarding the Motions to
12   Dismiss, one, is Wells Fargo a necessary party for purposes
13   of subject-matter jurisdiction; and two, could Tristan, and
14   the new holders as the parties who created Laren to
15   facilitate the transactions that are at issue in this
16   lawsuit, reasonably have expected to be summoned to the
17   United States; specifically, the state of Minnesota, to
18   litigate indenture issues.   The answer to both questions is
19   yes.   This is not a simple escrow agent, two-page agreement.
20   This is an indenture of trust regarding the issuance of
21   almost over a half a billion dollars worth of debt.   In order
22   to understand the issues and the rights of the parties, you
23   have to understand first the role of the indenture trustee.
24   The trustee is essentially a creature of contract.   When
25   companies like Tristan want to access debt markets in the

1    U.S., they must do so through an indenture of trustee -- or
2    -- they often do so through an indenture of trust.   A
3    trustee, like Wells Fargo, is appointed to represent the
4    interest of the holders and administer the rights of all of
5    the holders under the indenture.   So, essentially, you have
6    the trustee that is in place.   That's why it signs the
7    agreement and it signs the indenture.   And the notes that are
8    issued are freely tradeable.   They're not identifiable.   The
9    notes are paid through DTC, the Depository Trust Company, in
10   New York.   And Euroclear is a similar function in the
11   european markets, where the notes will trade and the payments
12   are made.   The indenture trustee is put in place and
13   contracted to represent the interest of the holders.   So it
14   is the only other party to the agreement, other than Tristan,
15   if there is a breach-of-contract action, as the Court held in
16   other cases, the two parties to the agreement are, by
17   definition, necessary parties.   We agree -- and we'll get to
18   this a little bit later -- that the rights and interest of
19   the holders have to flow through the indenture.   And that's
20   precisely what's going on here.   We have to pursue the claims
21   against Tristan and Laren and, indirectly, the new
22   noteholders, through the indenture, because we're pursuing
23   the claims on behalf of all existing holders and the trustee
24   has to administer those rights.   It is absolutely necessary
25   to this litigation and to the Court's rulings, determinations

1    and implementations of any remedies in this litigation.

2                THE COURT:  That might be the case.  But you're

3    not alleging some independent wrongdoing on the part of the

4    trustee.

5                MR. FISCO:  No.  The trustee didn't do anything

6    wrong, your Honor; but, more importantly, the trustee is the

7    party who was wronged.  The trustee should, in ordinary

8    circumstances, be the plaintiff in this case and it's not,

9    because it needs to represent the interest of the holders.

10   And the reason that it's not the plaintiff in this case, and

11   the reason that it hasn't been pursuing remedies for over a

12   year, is because it has a conflict of interest with respect

13   to the holders.

14               THE COURT:  But if it were the plaintiff, as

15   counsel pointed out, who would they be diverse with who was a

16   defendant?

17               MR. FISCO:  It doesn't matter.  They're the

18   defendant in this case because they're not doing anything.

19   And the reason is the no-action clause.

20               THE COURT:  With each other; is that what

21   you're saying?  I don't understand.

22               MR. FISCO:  Excuse me?

23               THE COURT:  Doesn't there have to be diversity

24   between the plaintiffs and the defendants?

25               MR. FISCO:  In this case there is diversity

between the plaintiff and the defendant.  Because the trustee
in this case has to be the plaintiff, because it has not
acted in light of an event of default, it has not acted in
light of the breaches of contract.

THE COURT:  And if the trustee should be
aligned as a plaintiff, who is the diverse defendant?

MR. FISCO:  The diverse defendant in this case
-- I agree, your Honor, it's highly unusual -- I've been
doing this for 25 years.  It's highly unusual that the
trustee is not taking a position.  And it has to be the
defendant because it is not taking a position because,
indirectly, the remedies that are sought here go against
other holders.  So the trustee is in a conflict position.

THE COURT:  So the trustee should be a
plaintiff, a Minnesota resident, and the diverse defendant is
the trustee, a Minnesota resident.

MR. FISCO:  Under the facts of this case, the
defendant, the party to which the existing noteholder,
plaintiffs, seek a remedy, is the trustee, because the
trustee is not acting.  It did not do anything wrong with
respect to issuing the new notes because it was not required
to investigate the officer certificate that was given to it,
saying it complied with the indenture.  And Section 412 of
the indenture didn't apply because it wasn't an affiliate
transaction.  It's entitled to rely on those.  So it didn't

1    do anything wrong, but it was the party that was harmed.

2    And it is not doing anything with respect to those breaches

3    because it can't, because there's two sets of holders, the

4    holders that benefited from the wrongful transaction, and the

5    holders that were harmed by wrongful transaction.  It's

6    paralyzed to act.  So under the unique circumstance of this

7    case, it has to be the defendant.  We didn't create those

8    facts.  It's the trustee that's not acting.  So, in this

9    case, we are seeking very specific relief against the

10   trustee.  And we have to because the trustee is failing to

11   act.  And if we walk through the indenture provision, you'll

12   see why there are ongoing, continuing duties.  And the

13   trustee is not doing anything with respect to events of

14   default, because it has to determine whether or not this was

15   a violation of Section 412 -- we think we've already proved

16   that -- and if that's the case, the effective remedy or

17   partial remedies will be against other holders.  So it's

18   paralyzed.  So let's walk through the indenture provision,

19   because it's a complicated document.  Section 701 says:  "If

20   an event of default has occurred, and is continuing, the

21   trustee will exercise such of the rights and powers vested in

22   it by this indenture, and use the same degree of care and

23   skill in its exercise as a prudent person would exercise or

24   use under the circumstances of the conduct of such person's

25   own affair."  An event of default exists right now.  It

1    didn't exist at the time of the issuance, but it exists right

2    now.  Had Tristan not lied in its officer certificate, the

3    trustee would have.  If the officer said:  "This violates

4    Section 412," and the trustee still issued the notes, there

5    would have been a claim against the trustee.  But that's not

6    what happened.  As part of its rights, it is entitled to rely

7    on the officer certificate and it is not required to

8    investigate it.  That fact is irrelevant because the harm

9    still occurred.  And the harm occurred under the indenture,

10   and the indenture trustee was the party that was harmed, even

11   though it was entitled to rely on it, and didn't have to

12   investigate.  And, ultimately, the harmed party, the trustee,

13   represents the interest of the holders.  And for that

14   specific transaction, the only holders that existed were the

15   existing holders.  So we are the aggrieved party, and we have

16   to go through the indenture trustee to enforce our rights and

17   the trustee can't, because the trustee can't be in a dispute

18   where it's going to be fighting about which one of its

19   holders gets certain cash or which one of its holders' notes

20   should be canceled because of the circumstances of Tristan's

21   breach of the agreement.

22              THE COURT:  I don't think anybody is

23   challenging whether you have a right to proceed.  I think

24   what they're challenging is whether you have a right to do

25   that in this forum.

1           MR. FISCO:  I think we do have a right to --

2      well, first of all, I think we are challenging whether we

3      have a right to proceed, because that's what the no-action

4      clause is.  Let's jump to that for a second.  Let's look at

5      Section 6.06 because that's a key provision as it relates to

6      the trustee and the holders.  It says:  "Except to enforce

7      the rights to receive payment of principal and interest, no

8      holder of a note may pursue any remedy with respect to this

9      indenture or the note, unless they first make demand on the

10     trustee."  Holders of at least 25 percent.  And I'll note,

11     it's not 50 percent as counsel for the defendant said.  It's

12     25 percent.  And the existing holders represent 35 percent of

13     the note.  So that requirement is met.  We can direct the

14     trustee.  Then we have to offer security or indemnity.  And

15     the trustee has 60 days to comply with it.  And the only

16     circumstances where the trustee doesn't follow it is a holder

17     of a majority and aggregate principal amount of the

18     outstanding notes give contrary direction.  The key provision

19     is the last sentence that was not discussed by the

20     defendants.  It says:  "A holder of a note may not use this

21     indenture to prejudice the rights of another holder of a note

22     or to obtain preference or priority over another holder of

23     the note."  That is precisely what has to happen in this case

24     because they were wrongfully issued.  The trustee can't

25     follow the direction.  We cannot direct the trustee.  We have

1    the ability and the power and everything.  But it says
2    specifically the trustee cannot take that direction because
3    it is involving other holders that are holders under the same
4    indenture.  That's the conflict.  A very unique situation.
5    And I've been doing this for over 20 years.  That provision
6    is not in many of the indentures.  If you look at the
7    *Feldbaum* decision, it doesn't have that provision in
8    there.  It's a very specific provision.  And the trustee
9    cannot act if it's going to have a preference or priority
10   over one holder versus another.  So we're left with it
11   doesn't apply.  Section 6.06 does not apply.  But that begs
12   the question.  It doesn't answer it.  We still have to
13   exercise all of our remedies and all of our rights through
14   the trustee.  It is the only party to the agreement.
15          If we look at Section 412 and apply some of the
16   facts here, it's key.  412 basically says:  "The company and
17   the guarantors will not make any payment to, or sell, lease
18   transfer or otherwise dispose of any of its properties or
19   enter into or amend any transaction, contract, agreement,
20   understanding, loan, advance, guarantee, any transaction with
21   an affiliate unless the affiliate transaction, if it's in
22   excess of one million dollars, is a no less favorable terms
23   to the company than if it were a comparable transaction with
24   a nonaffiliate."  That's not applicable here, because it's
25   more than a million.  And it goes on to say:  "If the company

1      delivers to the trustee, that if it's a three million-dollar

2      transaction, it has to be approved by a disinterested

3      director."  The disinterested director has resigned as a

4      result of this transaction.  And that's in the Complaint.  So

5      they couldn't have met that.  The third one says:  "With

6      respect to an affiliate transaction or a series of related

7      affiliate transactions involving aggregate consideration in

8      excess of ten million dollars, an opinion as to the fairness

9      of the company from a financial point of view issued by an

10     accounting, appraisal or investment banking firm of national

11     standing."  Both 2(a) and 2(b) apply in this circumstance

12     and they couldn't comply with it.  They had no independent

13     director and they had no opinion.  So it's absolutely proven

14     in the facts without discovery that they did not -- and

15     subsequent to the issuance of notes -- this is an important

16     fact -- subsequent to the issuance of notes, all these facts

17     started coming out.  The auditors for Tristan have concluded

18     that Laren, the entity under which they conducted this

19     transaction, is, in fact, an affiliate.  And the noteholders

20     have conceded, after the transaction, that they had some

21     interest and involvement in creating Laren to facilitate this

22     transaction.  So Tristan and the new noteholders got

23     together, created Laren to create this transaction that

24     violated Section 412.  If you look at the nature of the

25     transaction, the new notes of a hundred and eleven million

1    dollars were actually issued for no additional consideration.

2    There were several entities involved in this transaction --

3    Tristan, Laren, its affiliate, Montvale, its affiliate, TNG

4    and KPM, the guarantors, and also guarantors of the existing

5    notes, as well.   There was a 60 million-dollar loan

6    transaction from the new noteholders to Laren.   That loan

7    transaction, $30 million went upstream to Tristan, $30

8    million went to Montvale.   But they're entitled to repayment

9    of the entire $60 million, and guaranteed by the only two

10   operating subsidiaries of Tristan.   So they get their $60

11   million back plus 35 percent interest.   In addition to that,

12   they get a hundred and eleven million dollars of notes.   So

13   they actually paid no consideration for the notes, because

14   all of these entities are part of an affiliated group of

15   entities.   The conduct of Tristan and the conduct of the

16   noteholders are one and the same.   The trustee, because they

17   are now a noteholder, and it didn't notice when it issued the

18   notes -- and it was entitled to rely on it -- so it did not

19   do anything wrong up to that point.   It had to rely, and it

20   did, but it was false.   So what's the remedy available to the

21   existing noteholders who were the parties that were damaged?

22   They have to pursue a claim, and they have to pursue a claim

23   in this court.   And the trustee has to be a party to it

24   because we are now required to make the trustee act in a

25   fiduciary capacity for only a portion of the notes.   It has

1    to be involved in this claim.  It's the only party under

2    which we can act; it's the only party that can pursue

3    remedies; it's the only party that can enforce the liens that

4    are the stock certificates of the two entities that

5    guaranteed the debt, TNG and KPM; it's the only entity that

6    can pursue that.  We have no right to do that, even if we

7    tried to do that.  There's different provisions of the

8    indenture which restrict a holder's right to receive anything

9    other than principal and interest when due.  It's not lost

10   that nothing has happened in a year and a half, because

11   Tristan and the new noteholders have paralyzed the trustee

12   into taking no action at all.  They have to be involved.

13          They said the new noteholders asserted this is

14   not ripe for adjudication.  It's absolutely ripe for

15   jurisdiction.  We have an existing event of default.  And

16   Section 7.019(a) of the indenture provides that the trustee

17   must act to represent the interest of the holders in event of

18   default and must act as a fiduciary.  It's not happening.  So

19   we have to bring this action in order to get it to act as a

20   fiduciary.  What does that involve?  We don't know.  We don't

21   have any of the discovery.  We do know that we want them to

22   not make any distribution until these issues are resolved.

23   And if you look at the distribution provisions -- which are

24   very relevant -- Section 6.10, Priority.  "If the trustee

25   collects any money pursuant to Article 6" -- which is

1    collection after an event of default -- "it shall pay out the
2    monies or properties in the following order, first, to pay
3    its fees and expenses, then to holders of the notes ratably
4    without preference or priority of any kind according to the
5    amounts due and payable on the notes for principal, interest,
6    fees and costs."  So it has specific instructions as to what
7    to do.  This court has to say, "You can't follow that."
8    "Because of the fraudulent transfers, because of the nature
9    of the thing, you cannot distribute any money until I" --
10   your Honor is done ruling on the merits of this litigation.
11              THE COURT:  You make a very compelling case,
12   and you did last time, about whether there's any wrongdoing
13   underneath here.  The question is do I have subject-matter
14   jurisdiction and personal jurisdiction.  That's the heart of
15   it.  And you're right, they argue in a no-action provision
16   you can't bring this action.  But let's get to the heart of
17   jurisdiction here.
18              MR. FISCO:  The heart of jurisdiction is all
19   remedies have to flow through the trustee.  We started this
20   action because the trustee was paralyzed to do so.  So from
21   this point forward, the trustee has a continuing fiduciary
22   duty to represent the interests of all holders.  This court
23   is going to have to have the trustee here to respond to what
24   it can do; what it's willing to do; what it's not willing to
25   do.  And there are other provisions of the indenture that say

1     the trustee doesn't have to act if any action has been
2     involved with personal expense or expose it to personal
3     liability.  The trustee can assert that, regardless of what
4     the Court does, because the trustee is going to say:  "I have
5     to go to another country to enforce this judgment," yet
6     there's a specific instruction that says you can't
7     distinguish between holders.  You have to distribute all sums
8     ratably without preference or priority of any kind according
9     to the amounts due and payable on the notes.  That's one
10    provision.  The second provision at issue here is the rights
11    of the holders.  They are entitled to receive principal and
12    interest due on the notes.  And we cannot do anything with
13    respect to collecting against the operating subsidiaries
14    because the liens are held by the trustee exclusively.
15    Section 6.07 says:  "Rights of the Holders to Receive
16    Payment."  It clearly identifies that holders can receive
17    principal and interest when due.  And, then, it goes on to
18    say:  "provided that a holder shall not have the right to
19    institute any such suite for the enforcement of payment if
20    the prosecution results in the surrender, impairment, waiver
21    or loss of the lien on this indenture upon the property
22    subject to this lien."  These are just some of the examples
23    of a very complicated indenture directing the trustee on how
24    to implement and enforce the rights on behalf of all holders.
25    That has to be part of this litigation.  And the trustee is

1    entitled to say: "I'm willing to do that." "I'm not willing
2    to do that." This is not even feasible. It's even been
3    further complicated because now the notes have been
4    transferred.
5                THE COURT: But this trustee, apparently -- and
6    I'll ask him in a moment -- doesn't intend to take any
7    position in this matter.
8                MR. FISCO: Exactly.
9                THE COURT: I think this trustee is just
10   waiting for direction from this court or any court for an
11   adjudication of the issues and then will follow.
12               MR. FISCO: It's not that simple, your Honor,
13   because now the notes have been transferred. Now there's
14   good-faith purchasers for value. What's fair? Shouldn't the
15   trustee, as the party with the fiduciary obligation, be able
16   to say: "That's not fair"? And on behalf of all the
17   holders, and as the trustee responsible for administering the
18   rights of those holders, in light of this event of default,
19   this holder did not have any involvement in this. This
20   holder paid fair consideration. This holder should not be
21   subject to a ruling of the court. If the existing defendants
22   continue to hold, it's easy, the trustee should be directed
23   to cancel. I agree. Some of the remedies that could
24   possibly be implemented in this case, the trustee would
25   implement, without question, once the Court found that

1    Tristan violated the indenture and the new noteholders were
2    the beneficiary of a fraudulent transfer.  But we don't know
3    where this is going to go.  The trustee as the party that's
4    responsible for the fiduciary obligation going forward has to
5    have an opportunity to say:  "I can't do that, your Honor."
6    If the Court says:  "Go do this," and it's not possible, it's
7    not an effective remedy, because they are the party to the
8    agreement, and they are the party with respect to rights on
9    behalf of all the holders.  And the Court's ruling would say:
10   "Okay, trustee, you don't have to represent the new holders'
11   interest," except we have this issue with good-faith
12   purchasers for value.  That may have happened because the new
13   noteholders traded.  If we got monetary damages from them,
14   it's less of an issue.  If we don't get money damages from
15   the new noteholders, there's going to be some kind of
16   equalization that has to come up or some kind of further
17   investigation.  "Did you know"?  "Were you a good-faith
18   purchaser for value"?  "Are you an affiliate of Tristan"?
19   Are you an affiliate of Stati"?  "Are you an affiliate of one
20   of the new noteholders"?  Those are all issues that have to
21   be adjudicated and dealt with.  And the trustee is the party
22   to which the Court should be directing those questions, and
23   the trustee should be answering those.  We have no ability to
24   control the remedies, we have no ability to control the
25   distribution.  We are not a party to the agreement.  We are

standing in the shoes of the trustee for the sole purpose of
instituting this action.  The trustee is responsible for the
fiduciary duties going forward once the Court determines that
it was a fraudulent transfer.  That's why the trustee is a
necessary party in interest.

Let's then move to personal jurisdiction over
Tristan.  They say that Section 543.19, the long-arm statute,
there was no transaction of business in Minnesota.  They
assert that were no acts in Minnesota, and they assert there
was no injury in Minnesota.  None of that is true.  There was
a fraudulent officer certificate delivered to the trustee as
a Minnesota resident upon which it acted that caused injury
to the parties the trustee was contractually obligated to
represent as a fiduciary.  It doesn't matter that there
wasn't an event of default at the time because the fraud
concealed the event of default.  Had Tristan advised the
trustee, "By the way, we ignored the affiliate transaction,
Section 4.12, the trustee wouldn't have been able to issue
the new notes.  They would have been issued in violation of
the indenture.  If the new noteholders and/or Laren and/or
Tristan would have said, "Oh, by the way, we're breaching our
debt covenant under Section 4.10," they wouldn't have been
able to issue the notes and the trustee would have never
authenticated and delivered the notes.  So it's all part of
the same theories and the same part of the transaction.

1       Tristan chose to come to the United States to access

2       investors for the first $420 million.   Tristan retained

3       Jefferies, a U.S. investment banking firm, of national

4       reputation.   They had road shows in Connecticut, New York,

5       Los Angeles, Minnesota.   In Minnesota, they solicited CarVal

6       Investors, Whitebox Advisors, Wayzata Investment Partners,

7       Deephaven Capital, and Varde Partners.   This is not just a

8       phone call to Minnesota or a letter to Minnesota.   They are

9       in Minnesota dealing, trying to sell a bond, and using the

10      U.S. markets to raise funds for its own purposes.   CarVal, in

11      fact, advised certain of its funds to invest in both

12      tranches, which constitutes the existing notes.   That's all

13      in the affidavit of Chapman, paragraph six, Ramli, paragraphs

14      eight and ten.   And some of that is even confirmed by

15      Tristan's own affidavits, their contacts with Minnesota.   In

16      addition to the solicitation, Tristan executives visited

17      Minnesota.   The Tristan CEO, Anatol Stati, and CFO, Artur

18      Lungu, visited Minnesota in September, 2006 to discuss the

19      possibility of Wells Fargo to act as trustee.   Tristan chose

20      to enter into an indenture with Wells Fargo in Minnesota, a

21      resident of Minnesota.   Tristan, then, twice amended the

22      indenture, sending documents and communicating with the

23      trustee here.   Tristan named Wells Fargo as the registrar,

24      paying agent, and custodian under the indenture.   Tristan

25      maintains an office in Minnesota, required under the

1    indenture.  It's their document.  They're the ones that said:

2    "Let's do that in Minnesota with the trustee."  The indenture

3    requires Tristan to maintain an office or agency where notes

4    may be surrendered for registration of transfer or for

5    exchange, and where notices and demands to or upon Tristan in

6    respect to the notes of this indenture may be served.  Its

7    agent is in Minnesota.  It contacted a Minnesota resident to

8    act as its agent, and it has an office in Minnesota, through

9    its agent, for those purposes.  It's not a letter.  That's

10   not a phone call.  That's a visit to Minnesota.  That's a

11   contract with a company in Minnesota, and that's maintaining

12   an office through that contact in Minnesota.  They purposely

13   designated Wells Fargo offices in Minnesota to fulfill this

14   function.  Tristan maintained continuous contact with

15   Minnesota after that.  They agreed to send notices or

16   communication to Wells Fargo in Minnesota.  Annual compliance

17   certificates were delivered to the trustee in Minnesota.

18   Tristan agreed to deliver to the trustee in Minnesota any

19   notices of events to default.  Tristan agreed to deliver to

20   the trustee in Minnesota a fairness opinion in their Board

21   resolution in conjunction with any affiliate transaction.  It

22   wasn't done here.  But all of those deliveries are to the

23   trustee in Minnesota.  Tristan issued notes on three

24   occasions -- October, 2006 for 300 million, June, 2007 for

25   120 million, and in June, 2009 for 111 million.  Before each

1    issuance, Tristan delivered to the trustee in Minnesota an

2    authentication order, notes for signing by the trustee, an

3    officer certificate, and an opinion of counsel.  And the key

4    is the officer certificate, with respect to the issuance of

5    the 111 million-dollar note, was false.  That's a harm to a

6    Minnesota resident, that caused harm in Minnesota, and that

7    was delivered to a Minnesota resident in Minnesota.  That's

8    the harm in Minnesota that the Court can rely on for

9    subject-matter jurisdiction and personal jurisdiction over

10   Tristan.  Tristan contacted the trustee in Minnesota in June,

11   again, with respect to issuance of the new notes.  That is

12   the basis of the lawsuit, that is the basis of the fraud, and

13   that occurred in Minnesota.

14             THE COURT:  Not to dispute this too much, but I

15   think what the defense is saying is that even if this were

16   true, the fraudulent officer certificate didn't cause harm to

17   a Minnesota resident.  It caused harm to you guys.

18             MR. FISCO:  It caused harm to us.  And they're

19   our agent, your Honor.  That's what the indenture provides.

20   They have a fiduciary obligation to us.  They are the party

21   through which we act.  They hold all of our rights.  There

22   can never be harm to the trustee in any circumstance.  It

23   doesn't have a note.  And it's entitled to rely.  The

24   indentures aren't drafted for fraud.  They're drafted to let

25   the commerce go forward.  They access the U.S. capital

1       markets.  These transactions happen all the time.  They're

2       not based on fraud.  The trustee shouldn't be required to,

3       and they shouldn't pay the trustee to, investigate every fact

4       and every officer certificate.  That's what those provisions

5       are designed for.  And when they don't work because the

6       issuer commits fraud, the trustee was harmed, because the

7       trustee is our representative.

8                   THE COURT:  I don't have any trouble seeing how

9       the trustee would be harmed, if that's true.  I have a hard

10      time seeing why that matters, because you're the plaintiff.

11                  MR. FISCO:  We're not the plaintiff.  We're the

12      plaintiff, standing in the shoes of the trustee, solely for

13      bringing the action.  And once the Court determines it, the

14      trustee has to go back to administering all of the rights and

15      obligations.  As we've just talked about, we can't guess

16      today what the appropriate remedy might be.  We can't guess

17      today who the other holders are.  We are not seeking damages

18      against the defendants individually.  We are seeking damages

19      for all existing holders through the trustee.  It's a

20      critical issue.  We're not asking them to pay us fees and

21      expenses, we're not asking them to pay us principal and

22      interest due on the notes.  We're asking for the trustee to

23      implement this -- to basically pay the trustee for the damage

24      that you caused the trustee as the representative of all the

25      existing noteholders.  It's critical.  There's no other way

1    to pursue this.  It has to go through the trustee.  And it

2    has to be here.  We can't drag the trustee to the British

3    Virgin Islands and say:  "Now you have to defend a lawsuit

4    instigated by Tristan."  And there's plenty of contact for

5    Tristan in Minnesota to justify exercise of personal

6    jurisdiction.  For similar reasons, the Court has

7    jurisdiction over the new noteholders.  They were the

8    creditors of Laren.  Laren is an affiliate.  They were

9    involved in every aspect of this transaction.  The defendants

10   want you to say:  "Let's put some of these facts over here,

11   and let's put some of the facts over there, and let's not

12   look at the indenture," "And then we can say there's no

13   contact with Minnesota."  It was one fraudulent scheme

14   conducted in one transaction, a 60 million-dollar loan that

15   was guaranteed by all the affiliates, $111 million in notes

16   issued fraudulently to them, and they were working with

17   Tristan.  They also came back to Minnesota and said:  "Now,

18   we don't like definitive notes."  And there's a difference

19   between a global note and a definitive note.  A definitive

20   note is specifically held by the trustee in the name of the

21   holder.  And the facts and circumstances -- and, again, this

22   is without discovery -- Laren was the one that purchased the

23   notes, yet they were delivered to the new noteholders.  Why,

24   if Laren was the purchaser of the notes for the $30 million,

25   were they delivered directly to the creditors of Laren?

1    Because this whole Laren facility is a sham transaction,

2    concocted both by the new noteholders and by representatives

3    of Tristan.  It's one fraudulent scheme.  And that's why

4    Tristan's contacts with Minnesota should be imputed on them.

5    Because then they came back individually and asked the

6    trustee -- said:  "We don't like the definitive notes.  Let's

7    put them into a global note," and the trustee said:  "Okay,

8    give me all the requisite information and the requisite

9    requests from Tristan and the new noteholders to put it into

10   a global note."  Well, the trustee did that.  They provided

11   the documentation.  Again, the trustee didn't know that it

12   was fraudulent, didn't know that the notes were issued

13   fraudulently.  The trustee complied.  So now there's two

14   global notes with separate CUSIPs.  Again, you can

15   distinguish the existing notes from the new notes.  Well,

16   that wasn't good enough for them.  They wanted the trustee --

17   they came back again to Minnesota, and said:  "Let's merge

18   them now."  And each time there were officer certificate

19   requests.  And they specifically benefited from the contacts

20   in Minnesota.  They came to Minnesota because it facilitated

21   their desire to make these notes indistinguishable from the

22   other notes so they can trade it on the market.

23            Let's go back to what we talked about earlier.

24   The trustee is up here and these notes trade.  Now they're

25   all trading under one CUSIP, and a buyer can't distinguish,

1    because there's no separate CUSIP number and they're not

2    definitive notes.  They all look the same.  The Court has to

3    ask:  "Why would they spend so much time and effort to make

4    those notes virtually indistinguishable from the other

5    notes"?  Because they wanted to essentially say:  "We can

6    just launder this fraud, and we'll sell the notes, and we're

7    out of it."  So we have to have jurisdiction over them,

8    because they did come to Minnesota to further facilitate the

9    fraud by getting definitive notes first, transferring those

10   for global notes second, and then ultimately -- which was the

11   issue in the probate court -- having the two global notes

12   merged under one CUSIP number so they can finally complete

13   the fraud.  And they did appear, and they asked for very

14   specific relief in the probate action.  They moved for

15   summary judgment.  They didn't appear and say:  "We contest

16   jurisdiction."  They were the party -- because the trustee

17   was neutral in that action, as well.  They were the party

18   that carried the ball, filed the Motion for Summary Judgment

19   that got them the relief that they wanted, and the Court in

20   the probate action had a very limited scope.  Based on the

21   language of the agreement, was the trustee required to merge

22   the notes, and the answer was yes.  The Court specifically

23   held it is not dealing with any of these issues.  They have

24   accessed and used and benefited from their contacts in

25   Minnesota, and they are also imputed with all because of the

1    insider relationship and because of the affiliation of these
2    parties, they are also imputed with the contacts of Tristan
3    -- which are significant -- from a due process standpoint and
4    from a long-arm statute standpoint.

5            I'll briefly address forum non conveniens.  The
6    only party that benefits from moving this to BVI is Tristan
7    and makes it, again, difficult for every party to pursue
8    remedies.  Tristan would love to have this action just go
9    nowhere and to paralyze the trustee for as long as possible,
10    because no remedies can be pursued except through the
11    trustee.  And you can see that in their argument.  On the one
12    hand, they're saying:  "Oh, you have a right to pursue
13    whatever you want."  On the other hand, they're saying:  "You
14    have to pursue it through the trustee because you're bringing
15    an action on the indenture."  It's exactly what they want.
16    They can't speak out of both sides of their mouth.  This is
17    the proper proceeding.  We are not seeking a benefit for just
18    us, we are seeking a benefit for all holders, consistent with
19    the fiduciary duties of the trustee.  The harm in this case
20    was directed as the trustee as the representative of the
21    holders.  Tristan submitted a false officer certificate to
22    the trustee in Minnesota, causing harm to all existing
23    holders.  That's the key to this case.

24            Equitable subordination, briefly.  The
25    equitable subordination claim is well-founded.  I won't cite

the cases that we have in the brief.  New York law recognizes
it in a circumstance where there's actual fraud.  The case
that they cite deals with constructive fraud.  This is not a
case of constructive fraud.  This is a case of actual fraud.
And, again, we will refer the Court to our brief for any
further points or arguments on that issue.

THE COURT:  I don't.  Thank you.

MR. FISCO:  Thank you.

THE COURT:  Brief response, Mr. Wiles?

MR. WILES:  Yes, your Honor.  Your Honor, I
want to try to start with the subject-matter jurisdiction
point.  Some of the argument that Mr. Fisco made -- I don't
mean this to sound wrong, but I feel like I'm shooting at a
moving target a little bit, because there are arguments that
he made about what they're seeking, whose rights they are
asserting; why they are asserting them, what the alleged
fraud was, that are nowhere to be found in the Complaint in
this case.  So rather than have that all kind of just sitting
out there -- I apologize, since I already spoke for a very
long time before, I'm going to try to be very methodical
about responding to what he said, and where it is and is not,
based on what's actually in the Complaint.  Now, one of the
things that Mr. Fisco said was that the trustee should be a
plaintiff, and that they're bringing this case because of the

trustee's refusal to act. All right. Now, when you say
that, it suggests that what you are doing is suing the
trustee, claiming the trustee has behaved badly, and that you
are seeking a remedy against the trustee because of the
trustee's own bad behavior. There is not a hint of any such
allegation in the Complaint in this case. And at the same
time that Mr. Fisco made that comment, he also openly
acknowledged to you that he is not claiming that the trustee
has breached any duty or that he is suing the trustee for
violation of any responsibility in the indenture. So this
idea that we named them because they refused to act, well,
it's words that sound like why you name a real party in
interest. But if you get underneath it and say: "Well,
okay, are you accusing them of something"? No, they're not.
It's nowhere in the Complaint. They have openly
acknowledged, even here, that the trustee did not behave
wrongly. Well, they say that the trustee is the only one who
can enforce liens. What does this case have to do with the
enforcement of liens? It has nothing to do with the
enforcement of liens. They say: "Well, the trustee's got
heightened duties and it's got more responsibilities because
there was a payment default in July of 2010." Well, this
case isn't about that, except the cause of action about
collecting interest. And if anything is clear, it's that
they can sue on their own to try to collect payments due to

1    them.  They don't need the trustee for that.  So what does
2    that default have to do with anything.  What Mr. Fisco said
3    was, in effect, this is a derivative action.  That, in
4    effect, he is here in the name of Wells Fargo, asserting
5    rights that belong to Wells Fargo under the indenture, and
6    that he's doing it only because Wells Fargo has been silent
7    or it just has been inactive or because it can't effect.
8    Well, that's interesting.  I certainly don't get any of that
9    in the Complaint.  There is nothing in the caption or in the
10   allegations of the  Complaint that says that these plaintiffs
11   are suing in the name of Wells Fargo and for the benefit of
12   anybody other than themselves or to assert rights that belong
13   to anybody but themselves.  Page one of the Complaint lists
14   the individual funds who are plaintiffs and defines them as
15   plaintiffs or the existing holders.

16              The prayer for relief.  Damages in favor of the
17   existing holders, these plaintiffs, to the extent that they
18   have been damaged by Tristan Oil's and the new holders'
19   alleged acts and omissions.

20              An injunction against merger of the notes --
21   which is irrelevant now.

22              An injunction against distributions on the new
23   notes.  That's the classic stakeholder example.  Every single
24   nominal party case that we have, the nominal party is there
25   just to direct that the funds that it receives or holds go to

1        one party instead of another.

2                Permanently enjoining the new holders from

3        selling their notes.  Well, that's gone.  That's already

4        happened.

5                Avoiding the sale and issuance of the new

6        notes.  They don't need the trustee for that.  The trustee

7        does a ministerial job of following the direction by Tristan

8        and the new holders.

9                And, then, they have their equitable

10       subordination relief.

11               There's nothing there that requires the trustee

12       or that amounts to a right that belongs to the trustee that

13       they are attempting to enforce or that purports to be a

14       derivative claim.  I don't know of any authority that says

15       that a noteholder can stand in the shoes of the trustee and

16       appoint itself to do that.  The noteholder either has its own

17       right or it doesn't.  It doesn't get to come in and say:  "I

18       am Wells Fargo."  And that is an credible allegation to arise

19       for the very first time in the argument of a Motion to

20       Dismiss, having never appeared in the Complaint itself or in

21       the argument of the injunction or in the extensive briefing

22       on the Motion to Dismiss.  That's simply not what is

23       happening in this case.

24               Mr. Fisco repeated the comment that all the

25       remedies flow through the trustee.  And this is the same

1    language that's been used throughout the existing

2    noteholders' brief, and it was used during the injunction.

3    And I have to tell you, I just don't know what that is

4    supposed to mean.  Yes, if the trustee had been a plaintiff

5    or were instructed to be a plaintiff might be seeking to

6    enforce remedies.  I spent as much time as I could when I was

7    up here the first time going through every single thing that

8    they alleged the trustee was supposed to do here, whether

9    distributing money, canceling a note when it's submitted for

10   cancellation, every single involvement that the trustee would

11   have in the relief that they seek.  And it's just like every

12   other case that we've cited to you, where the Courts have

13   held very consistently that those parties are just nominal

14   parties.  And to return to the point, they're nominal because

15   it doesn't matter if you think the relief you're seeking from

16   them is important.  You have to have a cause of action

17   against them.  Jurisdiction is not based on who it would be

18   convenient to have in the case to effectuate relief.

19   Jurisdiction is based on the causes of action and who the

20   parties to those are.  And, very clearly, those claims are

21   not with Wells Fargo.  Then we have the argument that:

22   "Well, this is a derivative case, so Wells Fargo is really

23   the plaintiff here.  It's only nominally the defendant."  You

24   hit the nail right on the head.  If that's true, that doesn't

25   solve your diversity issue.  Just putting it on the

defendant's side of the equation, but saying that, in effect,
you are here, and the only reason it is here is so that you,
the plaintiffs, can assert rights that belong to Wells Fargo
itself, is a classic case where you, under the Supreme Court
authorities, have to realign the parties.  And you would
simply treat Wells Fargo as a plaintiff in that case.  There
is no real U.S. party as a defendant.

Now, the next point that they alleged was that
the reason that they're asserting rights that belong to the
trustee is that the trustee can't do so.  And I want to read
to you more carefully the language of the provision that they
cited that supposedly says that.  And it's in Section 6.06 of
the indenture, which says that -- it was just the provision
that we cite the beginning of -- that says:  "No holder of a
note may pursue any remedy..." unless it does certain things.
Well, what Mr. Fisco said was that the trustee can't pursue
the claims that the holders want to assert here because it
would prejudice the new noteholders and, therefore, he, as
the holder of other notes, can pursue those claims.  But what
the actual sentence says is:  "A holder of a note may not use
this indenture to prejudice the rights of another holder of a
note or to obtain a preference or priority over another
holder of a note."  Now, what he has told you -- this is
their words, not mine -- is that that is the relief that they
are seeking.  He himself has said in his argument that the

1    relief they are seeking would prejudice the rights of another

2    holder of a note and give one set of noteholders a preference

3    or priority over the others.  He's affirmatively represented

4    that to you.  And he said to you that the trustee cannot

5    pursue that claim.  I submit to you that on the plain

6    language of the indenture itself, he cannot pursue that

7    claim.  It couldn't be clearer.  "A holder of a note may

8    not..." do this.  And with that admission by the plaintiffs

9    that that is what directly they are trying to do, I submit to

10   you that by their own characterization of their claims this

11   action must be dismissed.

12                Now, as to personal jurisdiction, Mr. Fisco

13   went to great lengths to say that we, my clients, the new

14   noteholders, were involved in the creation of Laren,

15   therefore, we could expect to be subject to a lawsuit about

16   the creation of Laren.  The problem is the claim against my

17   clients have nothing to do with the creation of Laren.

18   That's the claim against Tristan.  My clients are not a

19   defendant in that claim.  If you look at Count II of the

20   Complaint, which is the fraudulent transfer claim, it says --

21   paragraph 78 -- "Tristan Oil's sale and issuance of the new

22   notes was a fraudulent conveyance because it was made by

23   Tristan Oil with the actual intent to hinder, delay and

24   defraud the existing holders."  Paragraph 79:  "Tristan Oil's

25   sale and issuance of the new notes was a fraudulent

conveyance because" -- and, I'm sorry, but I do have a method
to this madness.  Please bear with me as I read it --

Subparagraph a:  "The new notes were sold and
issued by Tristan Oil when it was insolvent or it became
insolvent as a result thereof."  Well, that's something that
happened when the notes were sold.

B:  "When the new notes were sold and issued,
Tristan Oil intended to incur, believed or reasonably should
have believed that it would incur, or knew that it would
incur, debts beyond its ability to pay as it became due."
Well, there it is again, "...when the new notes were sold and
issued..."

C:  "The new notes were sold and issued by
Tristan Oil without receiving reasonably equivalent value and
exchange."  There it is again.  That happened at the time of
the issuance.

And D:  "The new notes were sold and issued by
Tristan Oil to the new holders without fair consideration."
There, again, it's at the time of sale.

Then there's an allegation that the sale has
damaged the existing holders -- which, by the way, are
defined as just these plaintiffs.  Not everybody.

Now, in his argument, Mr. Fisco said that,
well, we were involved in the creation of Laren, so we're
somehow involved in the creation of the fraud.  I read that

Count, I see nothing that has anything to do with Laren as far as the fraudulent transfer is concerned. Everything about that allegation has to do with the terms on which the notes were sold and the financial circumstances in which Tristan found itself. It has zero, absolutely zero to do with Laren's existence or participation or role in any single part of this transaction. Similarly, Mr. Fisco said that the merger of the notes was part of some dastardly scheme to hide their origin -- which is just -- I'll tell you, all it is is an effort to take advantage of the market, that's all it is. But he said, therefore, it's a part of the fraud. What fraud? The fraud that we're inventing when every time the issue comes up and we have a new theory of what the case is? There's no allegation against my clients here that the merger of the notes was part of a fraud committed by my clients. The claim against my clients is fraudulent transfer. And as I've just made clear, by reading through the allegations, that's a claim that's based on the issuance of the notes themselves. It has nothing to do with bringing them under the indenture and with the merger of the notes. Similarly, saying that Tristan's efforts to sell the existing notes in 2006 are part of the same transaction and are binding on my clients for due process purposes, I don't even think I -- I hope I don't even have to respond to that. It's ridiculous. My client's had nothing to do -- they weren't on the scene.

1    They had nothing to do with the sale of the existing notes in
2    2006 and are not chargeable with any of those contacts.

3              Next was the allegation that there was an
4    alleged harm in Minnesota.  And I'm confused by the answer,
5    because the answer seemed to be that, yes, without
6    equivocation, the trustee was not itself injured.  The people
7    who were injured were the non-Minnesota residents who are
8    plaintiffs in this case.  But either because the indenture
9    trustee is their agent or because they're standing in the
10   indenture trustee's shoes that somehow changes things and
11   makes it an injury in Minnesota.  Well, if I'm injured and I
12   have an agent somewhere else, that doesn't mean I'm injured
13   where that agent is.  I'm still injured where I am.  That
14   doesn't change the place of the injury.  So alleging that
15   Wells Fargo is your agent doesn't solve your personal
16   jurisdiction problem because it still doesn't give you an
17   injury in Minnesota.  Similarly saying that you want to stand
18   in Wells Fargo's shoes doesn't change where the injury is.
19   The important part of the admission there was that Wells
20   Fargo itself was not hurt, was not injured.  The people
21   claiming injury here, and the only ones for whom relief is
22   actually sought in this Complaint, are these individual
23   plaintiffs suing in their own right.  In fact, I find it very
24   odd to hear all this argument about how the plaintiffs here
25   are somehow just taking over Wells Fargo's position.  Because

1    up until now, the whole gist of their brief was that they

2    didn't need Wells Fargo, that they were entitled under the

3    indenture to take action on their own, and that the no-action

4    provision didn't apply, and that it was perfectly okay to

5    assert their own rights.  This is an entirely new way of

6    looking at the whole thing that isn't even consistent with

7    the Complaint.

8                Finally, on the point about what happened in

9    the probate court, and did we seek relief.  Summary judgment

10   is not relief.  Defendants seek summary judgment all the

11   time.  It throws a case out.  It's not a form of relief that

12   you seek.  The important thing is we did not initiate any

13   proceeding in Minnesota or anywhere else, nor did we, by our

14   conduct in the probate court, do anything that reasonably

15   could be interpreted as an agreement or acknowledgement that

16   a court in this state has jurisdiction over us personally or

17   is an appropriate place to resolve the issues that the

18   plaintiffs wish to raise.

19                I think I have responded to everything, your

20   Honor.  If you have any questions for me, please let me know.

21                THE COURT:  Thank you.  Does Tristan's counsel

22   wish to be heard?

23                MR. ULLMAN:  Your Honor, with respect to

24   subject-matter jurisdiction, as counsel for the new

25   noteholders said, we heard now for the first time that the

plaintiffs contend that they're really just going through the
trustee, I guess in some way suggesting that their claims are
derivative, or something.  I'm not really clear.  What I am
clear on is that they said things in their Complaint and
that's what this action is about.  However, they try to spin
it now.  And what they said in their Complaint is that they
are asserting individual claims against all the parties,
including, in particular, Tristan.  These are individual
claims.  They're not derivative claims, they're not agency
claims.  They're nothing else except individual claims for
which, among other things, the plaintiffs are seeking
individual damages.

Count I is for breach of contract against
Tristan.  What do they say in paragraph 76?  "As a direct and
proximate cause of Tristan Oil's alleged breaches of the
indenture, the existing holders have been damaged in an
amount to be determined at trial."

Count II is for fraudulent conveyance.  That's
also alleged against Tristan.  They also contend that they
were injured.  They contend they were injured individually
against all of the defendants except the trustee.  Yet, at
the end of the day, when you look in the relief section and
the non-substantive Counts, where the trustee is brought in
for injunctive relief, they're seeking some sort of remedy.
But that's all it is is a remedy only.  They're seeking

1 individual claims -- or -- asserting individual claims

2 against all the defendants.  The trustee is simply there to

3 facilitate relief.  That is the exact type of conjectural and

4 speculative claim against a nominal party that's been

5 disallowed in the cases that we've cited in our papers,

6 including, but certainly not limited to, the *Rose v. Giamatti*

7 case, which I've already discussed.  The claim against the

8 trustee is for facilitating relief.  It is hypothetical only.

9 It doesn't constitute a claim against the trustee for

10 diversity purposes.  They are nominal.

11     With respect to jurisdiction, it is also clear

12 from the Complaint -- and, again, despite how plaintiffs

13 might now like to spin it -- that their claims arose out of

14 the sale and issuance of the new notes and, also, with

15 respect to Count IV from the alleged nonpayment.  That's

16 what's said in Count I.  It says that Tristan Oil entered

17 into a valid and binding agreement where it agreed to do --

18 or, rather, not to do certain things.  And, then, they go on

19 in paragraph 75 to say:  "When Tristan Oil sold and issued

20 the new notes, it breached Section 4.10 and Section 4.12 of

21 the indenture because..." and then it goes on to allege what

22 they say are the actions constituting breach.  Now, of

23 course, we don't agree with what the plaintiffs are saying.

24 And while we're not going to get to the merits now, because

25 this isn't the appropriate time to do so, the Court should

1     have some flavor from the papers that were submitted on the

2     preliminary injunction motion that the charges that they're

3     making are wholly untrue. And they keep referring to Laren

4     as an affiliate. The only evidence before this court is that

5     it wasn't. But that's an aside. Because for these purposes,

6     we'll assume what they say is true. But if you assume what

7     they say is true, you have to also assume that the alleged

8     wrongs took place where they're alleged to have occurred,

9     which is outside of Minnesota. There is no contention that

10     the new notes were sold or issued in Minnesota. There is no

11     contention that Laren is a Minnesota company. There's no

12     contention that anything relating to what is contended to be

13     the alleged breach of contract that the plaintiffs are suing

14     on had anything whatsoever to do with Minnesota. And the

15     same thing is true with the fraudulent conveyance, unjust

16     enrichment and other causes of action that are alleged in the

17     Complaint. And it's also true of Count IV, which is for

18     nonpayment. There is no contention that these plaintiffs

19     entered into a purchase of the notes with Tristan in

20     Minnesota or that any of them is even a Minnesota resident

21     and was not paid in Minnesota. So the question, then, for

22     jurisdictional purposes is: "Well, what happened in

23     Minnesota"? and the answer is "What happened is absolutely

24     nothing that has any bearing on the claims." The only thing

25     they can even point to is the instruction letter to the

1      trustee, but that took place after the events that gave rise

2      to the claims in the Complaint. And, indeed, I don't even

3      have to look at the Complaint to do that. That's what

4      plaintiffs themselves said on this very motion. If you look

5      at page 39 of their brief in opposition to our Motion to

6      Dismiss, the plaintiffs say -- and this is in the first full

7      paragraph -- and I quote -- "The sale and issuance of these

8      notes" -- to the new notes -- "is the wrong that gives rise

9      to the existing holders' claim for relief." I'm not putting

10     words into their mouth. I'm not trying to spin what they're

11     saying. I'm simply reciting what they have represented to

12     the Court, which is exactly the same thing as what they've

13     said in their Complaint. In any event, as we've gone over

14     before, and in our briefing, the law is clear that sending a

15     communication into the state is not enough to support

16     personal jurisdiction. That is true under the state long-arm

17     statute. For example, in our briefing, we've obviously

18     talked about Section 543.19(d), which says that you have to

19     have injury in Minnesota. And there's only wrongful conduct

20     alleged overseas here. The other sections we've also talked

21     about in our brief and they're not enough to confer

22     jurisdiction, either. Section 543.19(c) gives jurisdiction

23     over someone who commits an act in Minnesota causing injury

24     or property damage. But that doesn't apply because the cases

25     make clear that sending a document from outside the state to

someone inside the state is not committing an act in the
state, for purposes of that section. We've cited the
*Northwest Airlines* case and, also, the *Wheeler v.* -- I think
it's *Tufail* case. Those are Minnesota state cases for that
point. There's also Section 543.19(b), which confers
jurisdiction over someone who transacts any business within
the state. Now, we've heard the suggestion that sending the
instruction letter might be transacting business in the
state. Well, it's not. The cases say that. And we cite for
that proposition the *North American* case, that's a federal
district case, and *Anderson v. Mattson,* again, that's a
District of Minnesota case. So the law is clear that no
matter how you slice it, no matter how they try to come at
it, you can't get in the long-arm statute. And if you can't
get in the long-arm statute, you can't come under the due
process clause, either.

     And with respect to the due process clause --
I'm not going to go through that analysis again -- but what I
seem to be hearing at the end of the day is, despite the
prior disclaimer, the plaintiffs really are relying on *Calder
v. Jones*, which they previously said doesn't apply. Because
that's all they can say at the end of the day is that, "Hey,
maybe there was a letter sent." "Okay, the letter wasn't
what gave rise to the claims, but we're going to cite to it
anyway." Well, even if you can get past that initial hurdle,

1    it's not enough, because under *Calder v. Jones*, the defendant

2    has to intentionally target the state.  Here, obviously,

3    Tristan wasn't targeting anyone in the state because the

4    plaintiffs are all from outside.  And one of the critical

5    elements of *Calder v. Jones* is there has to be injury to a

6    resident of the forum state and they can't get past that

7    hurdle, either, here.  As Mr. Wiles said, just alleging that

8    the trustee in some inchoate way was harmed doesn't cut it.

9    I don't know how the trustee could possibly be harmed.  The

10   trustee is not a holder of any notes, and is not acting as

11   the agent for any particular noteholder.  And, as Mr. Wiles

12   said, that couldn't be imputed outside the state, in any

13   event.

14              With respect to the no-action clause, I would

15   agree that the last sentence doesn't help the plaintiffs,

16   both for the reasons that -- that's the last section, Section

17   6.06 -- for the reason that counsel for the new noteholders

18   pointed out -- which, if anything, it just demonstrates why

19   the plaintiffs should not be here, and why this action should

20   not go forward -- but, in any event, doesn't apply to

21   Tristan.  So, in all events, the no-action clause applies in

22   full force with respect to Tristan.

23              And that leads into the last point, which is

24   the forum of non conveniens, which is, if they are going to

25   sue Tristan at all -- and we don't think they should.  We

1    don't think there's any basis for the claim.  But if there's

2    going to be a suit by them against Tristan, it should be in

3    the BVI -- in the courts of the BVI, and it would have to

4    comply with the terms of the contract.  We're not talking out

5    of two sides of our mouth.  We're not saying:  "If you sue us

6    in the BVI, we'll forget about the no-action clause."  If

7    they're going to sue us anywhere, in anyplace where the

8    jurisdiction can be found, they're going to have to comply

9    with the contractual requirements.  If they were to sue us in

10    the BVI, without having complied with the requirements of the

11    no-action clause, I believe we would make the same argument

12    there that we're making here, they're independent.

13    But, in any event, and for all the reasons that

14    I've gone through, this case does not belong in this court.

15    Thank you, your Honor.

16    THE COURT:  Mr. Fisco.

17    MR. FISCO:  A couple points, first, the

18    Complaint speaks for itself.  It's well-pled.  I'm not going

19    to walk through each of the provisions of the Complaint.  And

20    as to the remedies, it's not a moving target.  The remedies

21    and relief will necessarily depend on the circumstances of

22    this case.  From the last hearing to now, we were asking to

23    enjoin distribution of the notes -- merger of the notes so

24    they wouldn't be distributed.  Now we're dealing with

25    innocent third parties that may be purchasers; maybe not,

1    maybe.  We don't know what the relief is going to go (sic),
2    but we can't adjudicate or judge jurisdictional issues on a
3    Motion to Dismiss without having any of those facts and
4    understand the facts and circumstances of this case.  It's
5    just inappropriate.  Two, if I've misstated that the trustee
6    failed to act, let me clarify the record.  The trustee has
7    not acted.  And it has not acted because it cannot act.  It's
8    in conflict with the indenture.  If you take the provision of
9    Section 6.06, as the defendants have interpreted, what
10   they're saying is:  "We can do anything we want.  And as long
11   as we give it to another holder, and we have this provision
12   in there, there is no remedy."  The trustee has no job except
13   to represent the interest of its holders, particularly in an
14   event of default.  What purpose is that hundred-page document
15   if the trustee isn't required to do something if there's a
16   breach of the agreement.
17              Let's go back to the no-action clause -- I
18   mean, the limitation on suits, because it's very, very
19   specific.  I've been doing this for over 20 years.  I've
20   watched this case law develop.  And if you go back to
21   *Feldbaum v. McCrory*, that's the seminal case on it.  And
22   after the Judge goes through what's the purpose of a
23   no-action clause, there's two types of actions, there's an
24   individual holder right and, then, there's rights that harm
25   everyone jointly and equally ratably.  As to the first -- and

1      I'll give you an example -- a securities fraud claim that is
2      very specific to one holder, that the company sold it based
3      on misrepresentations to that holder.  That's not an action
4      that arises under the indenture.  And if you go through that
5      whole line of cases on the no-action clause, it will tell you
6      that.  It's not barred by the no-action clause because the
7      remedy and the relief is specific to the individual holder,
8      much like the right to collect principal and interest.  The
9      only thing that the holders get in this case -- they didn't
10     even get it -- there's a global note, and that global note
11     has nothing other than a right to principal and interest.
12     All of the rights of the holders are contained in the
13     indenture.  So what they're suggesting is that we can't
14     enforce those rights.  Of course we can enforce those rights.
15     We have to enforce them consistent with the terms of the
16     indenture.  And this line of cases on the no-action clause
17     came into existence because there were strike suits.  And if
18     you go and read all of the cases and read them side by side
19     and watch the development of this, they're distinguished
20     between rights that are for the benefit of all holders and
21     someone trying to beat everyone else to the courthouse and
22     get paid on their notes first.  If it's a remedy that's
23     available to the trustee for the benefit of everyone, what
24     the indenture says and what the no-action clause says that's
25     a right that has to be pursued by the trustee and, then, the

1   limitation on suits applies and you have to go through

2   Section 6.06.   As to individual rights, like to collect

3   principal and interest due on just your note, you can go

4   ahead and do that.   They don't need permission from anyone.

5   If that's what the holders were trying to do here, they could

6   have done it, and they would have just said:   "Pay me my

7   note."   That's not the issue here.   They are pursuing

8   remedies for the benefit of all of the existing holders under

9   the indenture.   They have to do that through the indenture and

10   they have to do that under the circumstances set forth in the

11   indenture.   And the trustee is paralyzed to take it.   And

12   that's what makes Section 6.6 not applicable here.   And if

13   you go to *Feldbaum*, after it talks about all the purpose of

14   what the no-action clause is, the Court very specifically and

15   very succinctly addresses this.   And I'll just read into the

16   record.   "I do not mean to imply" -- after the court said

17   this is barred by the no-action clause -- "I do not mean to

18   imply that courts will apply no-action clauses to bar claims

19   where misconduct by the trustee is alleged."   Not alleged

20   here.   We agree.   "For the same reason that equity has long

21   recognized that in some circumstances corporate shareholders

22   will be excused from making a demand to sue upon corporate

23   directors but will be permitted to sue in the corporations'

24   names themselves, bondholders will be excused from compliance

25   with the no-action provision where they allege specific facts

1    which, if true, establish that the trustee itself has
2    breached its duty under the indenture."  Again, doesn't apply
3    here.  The key is the next provision.  "Or is incapable of
4    disinterestedly performing that duty."  That's exactly the
5    situation here.  And if you follow the cases, the distinction
6    is between rights for the benefit of all holders under the
7    indenture versus the individual rights -- individual
8    securities fraud claims, individual right to collect
9    principal and interest.  This is not the individual pursuit
10   of rights, these are breaches of contracts that can only be
11   pursued through the trustee as the party to the agreement
12   governing the rights of all holders.
13             I'm not going to repeat all the arguments.  I
14   will state, though, very clearly that the fraudulent
15   certificate that is the basis of the issuance of the notes
16   was delivered to a Minnesota resident in the state of
17   Minnesota.  I don't think the Court needs anymore than that
18   for personal jurisdiction or subject-matter jurisdiction.
19             Finally, the new holders voluntarily
20   participated and obtained relief from the probate court.  No
21   one required them to come.  They filed a Motion for Summary
22   Judgment, and they voluntarily appeared and they benefited
23   from that appearance.  They can't now say:  "Oh, we didn't
24   really" -- "we just had to come and state our position
25   through a Motion for Summary Judgment.  The trustee wasn't

1    taking their position.  It was the existing holders versus

2    the new holders, the two parties that disputed that.  So we

3    think they clearly have contacts with Minnesota independently

4    of Tristan and, again, with Tristan as joint tortfeasor under

5    the Laren facility, it's very clear.

6                    Thank you, your Honor.

7                    THE COURT:  Thank you.  Anything further?

8    Anybody else need to be heard?  This is a complicated matter.

9    The Court will study it carefully and take it under

10    advisement.  Court is adjourned.

11                    THE CLERK:  All rise.

12                    (Court stood in recess at approximately 4:15

13    p.m., on April 7th, 2011).

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE PAGE

1

2

3     I, Ronald J. Moen, an Official Court Reporter for the
District of Minnesota, CSR, RMR, and Notary Public, do hereby
4     certify:

That the said MOTIONS HEARING was taken before me as
5     an Official Court Reporter for the District of Minnesota,
CSR, RMR, and Notary Public at the said time and place and
6     was taken down in shorthand writing by me;

7     That said MOTIONS HEARING was thereafter under my
direction transcribed into computer-assisted transcription,
8     and that the foregoing transcript constitutes a full, true
and correct report of the MOTIONS HEARING which then and
9     there took place;

10     That I am a disinterested third person to the said

11     action;

12     That the cost of the original has been charged to the
party who ordered the transcript of the MOTIONS HEARING, and
13     that all parties who ordered copies have been charged at the
same rate for such copies.
14
That I reported pages 1 through 93.
15
IN WITNESS THEREOF, I have hereto subscribed my hand
16     this 15th day of April 2011.

17

18                                    s/Ronald J. Moen
                                     RONALD J. MOEN,
19                                    OFFICIAL COURT REPORTER,
                                     CSR, RMR
20

21

22

23

24

25